| 45   331 |
| d92  266 |

## COLLAR v. FORD.

1. **Vendor and Vendee:** FRAUD: CONSIDERATION. Inadequacy of consideration will not of itself establish fraud in procuring a conveyance of land, but may be considered with other circumstances.

2. ——: ——: PRINCIPAL AND AGENT. The fact that one was requested to ascertain and report to the owner, who lived in another State, the amount of taxes due on a piece of land, which he did, did not constitute him an agent with respect to the land so as to charge him with fraud in buying the same himself for less than its actual value.

3. ——: ——: ——. An agent for the sale of land will not be charged with the duty of informing his principal of the value of the land in direct negotiations for its purchase by himself. When he becomes the buyer and the principal the seller, his agency with respect to the property ceases.

*Appeal from Chickasaw District Court.*

SATURDAY, DECEMBER 16.

ACTION to cancel a deed on the ground that the same was obtained by fraud. The facts are stated in the opinion. Decree for plaintiff. Defendant appeals.

*Ayers & Shaver,* for appellant.

*Potter & Hanan,* for appellee.

ADAMS, J.—To establish fraud the plaintiff relies to some extent upon the difference between the value of the land and the price which the defendant paid for it. The quantity of land is eighty acres. The amount paid by defendant was $58.94, including the taxes which were due on it. As to the value, the witnesses differ greatly; they estimate it from $240 to $600. Great as was the difference between the value and the price paid, this fact alone would not show fraud. It is a circumstance which may be considered with other circumstances.

The trade in this case was made by letters, and the letters with one exception are before us. One letter it is alleged is

lost, but its contents are testified to by plaintiff, and we will take his statement as true.

The land in question is in Chickasaw county. The defendant at the time of his purchase resided in that county; the plaintiff resided in Michigan. One N. H. Collar, uncle of the plaintiff, was residing in Clayton county. Just prior to the transactions which resulted in a sale to the defendant, to-wit: in 1868, said N. H. Collar was written to by the plaintiff to go to Chickasaw county and redeem the plaintiff's land from a tax sale. Said N. H. Collar was then out of health, and meeting the defendant, Ford, an old acquaintance of his, and resident of Chickasaw county, he engaged him to visit Hampton, the county seat of Chickasaw county, and ascertain the amount necessary to redeem the land from tax sale, and inform him by letter. Nothing at that time was said about Ford's acting as agent, farther than above set forth. Ford went to Hampton and ascertained that the land was sold for taxes two years before. This he reported in a letter to N. H. Collar, under date of Nov. 27, 1867, and among other things he said: "As your brother (meaning plaintiff, who was nephew instead of brother to N. H. Collar) lives at a distance, if he wishes me to see to it (the land in question), I will do as he may direct if I can. If he wants the taxes settled up and kept paid I will do it; or if he wants to sell it, let him set his price, and I will help him sell it if he should wish me to do so. The land don't lay where I understood you to say; it is further north, and on the same side of the road that Schoonover's is." This letter N. H. Collar forwarded to the plaintiff, having written on it as follows: "He (Ford) says that the land is on the same side of the road that Schoonover's is on. I thought it was on the north side and Schoonover's on the south. What say you? If it is on the south it is on the flat wet land." The letter written by Ford to N. H. Collar, and forwarded by him to plaintiff, was answered by plaintiff Feb. 2, 1868. In it plaintiff says: "My uncle, Newton H. Collar, sent me the letter you wrote him concerning my land. It seems that it lays on the south side of the road; the land that we looked at was on the north side. If you think that you can take the matter in

hand and make anything more than expenses, you may; if not, let it go. The land is so far off that I do not wish to be at any more expense about it. The land cost me $230; now, if you could get $25, $50 or $100 out of it, it would come very acceptable. Your letter was dated Nov. 27, 1867, but it did not reach me until about the middle of last month." Ford wrote immediately to the plaintiff, offering $25, and the plaintiff answered accepting his offer. Prior to the time that the plaintiff wrote Ford offering to sell for $25, $50 or $100, 2. —: —: Ford had received no authority to act as agent in selling the land; he had been simply employed by N. H. Collar to ascertain and report the amount necessary to redeem from tax sale. Whatever representation he made about the location of the land was volunteered. As to the quality he said nothing. The statement about its being wet land was made by N. H. Collar, and without Ford's knowledge. All that Ford said was that the land was farther north and on the same side of the road that Schoonover's was. By its being farther north it appears that he meant that it was farther north than Schoonover's. The representation by which plaintiff says that he was misled is that the land was on the same side of the road that Schoonover's was; in this, if anything, consists the fraud. Schoonover's was on the south side, and N. H. Collar wrote plaintiff that the land on the south side was wet.

Ford's statement in regard to the location of the land was not in our opinion fraudulent; he had not at that time been upon the land; he had been upon a farm which cornered on it; he might have been simply mistaken as to how the road ran. As to its being farther north than Schoonover's, what he said about it was true. It is in section 18, and Schoonover's is in section 20 in the same township, and it will be observed that sections 18 and 20 corner, the south line of 18 being an extension of the north line of 20. As to its being on the south side of the road, his statement was partially true; about half of it was on the south side. The road running from Schoonover's towards the land bore north of west, but when it struck the plaintiff's land it turned and ran south of west; had it contin-

ued in a straight line it would, we may presume, have brought nearly all the land south of the road. Notwithstanding the road turned and ran south of west across the plaintiff's land, it brought about half of it south of the road. There is no evidence that defendant knew that it was not all south until. after he bought; nor is there any evidence that he knew that the land was wetter on the south than north side. On the other hand, the evidence tends to show that the land on the south of plaintiff's was not in fact wetter, but dryer. One of the witnesses testified that the land in question was wetter than the land east or south of it. According to this testimony the true location was less favorable than that given it by Ford. Had the land been altogether south of the road it would, according to this testimony, have been dryer than it was; this shows that Ford's representation in regard to location was not fraudulent. It is true that if by his wrong representation, and N. H. Collar's error, combined, the plaintiff had been led into a mistake, and if the mistake was material, a court of equity might grant him relief upon that ground. But we think that the evidence shows that the mistake, if any, was not material; at least we are not satisfied that it was, and the burden is upon the plaintiff.

The plaintiff read in evidence the deposition of one Dunlap. He testifies that Ford told him, after boasting that he had made several hundred dollars in the trade, that the plaintiff wrote to him to go and see the land, and see what it was worth and write him, and that he reported to the plaintiff that the land was worthless. If Dunlap was not mistaken, we should have no doubt that the plaintiff was defrauded. But it appears that he was mistaken. If Ford made such a report to the plaintiff, the plaintiff knew it. Now, the plaintiff was himself a witness, and was examined closely as to what communications he received from Ford, and what induced him to sell the land so cheap. He undertakes to show what communications he received from Ford, but he testifies to no such communication as Dunlap says that Ford admitted that he made. If, then, the plaintiff, who was in a position to know

all about it, did not believe that he received any such communication, he cannot ask us to believe it.

We come now to consider the contents of the letter which the plaintiff says that he received from Ford, but which is now lost. The plaintiff, testifying in regard to the letter, says: "It stated that it lay south of the land I supposed I had bought, as was stated in the letter to N. H. Collar; that it was low, wet, what they call a slough, if where he described it; and said not more than half of it could be plowed." It will be seen that what is said about its being a slough is not Ford's language, but rather the witness' argument. Aside from location, what Ford appears to have said about it was that it was low and wet, and that not more than half of it could be plowed. Was this statement fraudulent? It was not if it was true. As to the character of the land we have the testimony of six witnesses. One says that it was wet, and he does not think that more than half of it could be broken that spring. Another says that it was mostly flat; probably two-thirds of it. Another says full one-half of it is rather wet for cultivation; wetter than the lands around it; rather wetter than the land east or south of it. Another says that part of it is as lands will average there, and part is slough. Another says it is rather a low, wet, flat piece of land. Another says that it is a pretty wet piece of land; he should judge about half of it very wet.

If these statements are compared with the statement which the plaintiff says that Ford made in regard to the character of the land in the letter that is lost, it will appear that Ford's statement was substantially true; at any rate, that the land was not any better than he represented it.

But it is said that Ford was the plaintiff's agent, and was under obligation to disclose to him the true value of the land. To this it may be said, that it does not appear that the plaintiff sought from him any such information. In the first letter which he ever wrote Ford he fixes a price at which he is willing to sell, and in the same letter he shows that he had himself been in the same neighborhood, and had at least a general knowledge in regard to the lands.

As to his land, he may have been misled slightly in regard to its location. He may have been led to think that it was all south of the road, when only about half of it was. But we are now satisfied that he was not misled to his injury; because if it had been farther south it would, according to the testimony of one witness, have been dryer land. Besides, he had substantially accurate information in regard to its character. He had learned from Ford that about one-half was wet and one-half arable. With this knowledge, he fixed his own price without any further inquiry. It is true he fixed it indefinitely. He said in his letter to Ford: "If you could get $25, $50 or $100 out of it, it would come very acceptable." Ford, without any further representations or communication in regard to the character or value of the land, offered to give the plaintiff $25, and the plaintiff immediately accepted the offer. Ford was to take the land subject to the taxes. (Was Ford under obligation to tell the plaintiff that the land was worth more? We can conceive of a code of morals so sublimated as to require that every purchaser should disclose to the seller the value of the property, if he knows its value and the seller is ignorant of it; but that is not the law.) "The seller of an estate must be presumed to be desirous of obtaining as high a price as can be fairly obtained, and the purchaser must equally be presumed to desire to buy at as low a price as he may." Story on Agency, section 210.

In the terse language of the civil law, it is said: "The buyer buys for the least possible; the seller sells for the most possible."

While an agent employed to sell the property of his principal is charged with the duty of obtaining the highest price he can fairly get; yet if he himself becomes the purchaser, and the principal the seller, he is under no obligation to assist the principal to obtain the highest price he can. The moment he becomes the buyer and the principal the seller, the agency in relation to that property ceases. The parties deal with each other, as it were, at arms length. This is necessarily so. It being the buyer's right to buy the property for the least he

can, he cannot be charged with the duty of aiding the seller to obtain the most he can.

If a person purchases property for less than its value by reason of a false representation made by him, upon which the seller rightfully relied, that would be ground for avoiding the sale. If, at the time of the representation, he was employed to sell the property, the case would be different. In such case the agency might constitute the ground of rightful reliance upon the representation. But we have seen no case, and we venture to say that none can be found, in which it has been held that a person who has been charged with the duty of selling property as an agent, and has made no false representation in regard to the property, if he lays aside the character of agent and negotiates directly for the purchase of the property himself, is bound to disclose to the owner the value of the property and see to it that he obtains a full price.

The plaintiff's trouble arises from the fact that he had become unnecessarily discouraged about his property. In his first letter to Ford, he said: "If you think you can take the matter in hand and make anything more than expenses, you may; if not, let it go. The land is so far off I do not wish to be at any more expense about it."

After he sold the land to Ford he discovered that he sold it for a very inadequate price, and now he comes into a court of equity and asks to be relieved from his foolish trade.

We are unable to discover under what rules of law the relief which he asks can be given.

REVERSED.