BENJAMIN DOUGLASS, JR., Appellant, v. E. H. and F. C. LOUGEE ET AL., Appellees.

**Principal and agent:** DUTY OF AGENT WHEN PURCHASING PRINCIPAL'S PROPERTY ON HIS OWN ACCOUNT: FRAUD: EVIDENCE. Where an agent having authority to sell the property of his principal proposes to become the purchaser on his own account, he must not only do so with his principal's consent, but he must in the strictest of good faith impart to his principal all the information which he has concerning the property and its value. Where, however, the agency was merely to lease and collect rents and such agent enters into independent negotiations with his principal to purchase the property, no suspicion of fraud arises from that fact alone, and he is under no obligation to assist the principal in obtaining the highest possible price, but the parties are then dealing at arm's length and it is the right of the agent to obtain the property for the least sum possible, without aiding the principal with reference to the sale.

In the instant case defendants' agency was to care for and lease the property in question, never having had any authority to sell; and upon a review of the evidence it is held that no fraud or concealment was practiced by the agents by which their principal was induced to sell the property to them for less than its value; and they are not therefore required to account for profits made on a resale of the property.

**Estates of decedents:** LEGACIES: SATISFACTION. In this action the owner of land in both this and a foreign State conveyed the property in this State to plaintiff and other heirs, subject to the payment, on the grantor's death, of a legacy to his widow. Subsequently the grantor conveyed the land in the foreign State to plaintiff in trust, subject to a life estate to the grantor. *Held,* that upon the grantor's death there was nothing left in the property in the foreign State for his estate, and that no part of the proceeds arising therefrom should be applied to the legacy of the widow in satisfaction of the charge against the property in this State.

*Appeal from Pottawattamie District Court.*—HON. .O. D.
WHEELER, Judge.

SATURDAY, DECEMBER 18, 1909.

REHEARING DENIED, SATURDAY, MAY 14, 1910.

SUIT in equity for an accounting from defendants,
who, it is claimed, were plaintiff's agents for the handling
of certain lands. The trial court dismissed the petition,
and plaintiff appeals.—*Affirmed.*

*Flickinger Bros.*, and *Louis F. Doyle,* for appellant.

*Mayne & Hazelton,* for appellees.

DEEMER, J.—Benjamin Douglass, Sr., at one time own-
ed something like three thousand one hundred and fifty
acres of land in Pottawattamie, Shelby, Mills, and Har-
rison Counties in this state. These lands were secured
by him at a very early date, and for a small price. In
September of the year 1897 he conveyed these lands to
his seven children, five of whom are represented by this
plaintiff; (reserving to himself a life estate therein), and
charging the property with two trusts or donations;—one
of $20,000 less the assets of his estate upon his death,
for the benefit of his wife, Louise Douglass, and the other
of $10,000 to secure a trust fund of which he was a
trustee.

Defendants were for many years the agents of the
senior Douglass for the renting of all of these lands, ex-
cept those in Shelby County, and they looked after the
same for him down until the time of his death, which
occurred May 4, 1900. Administration was had upon
the estate of the deceased in the state of California, where
he resided at the time of his death, and something like

$8,390 was realized from his personal estate, which was
applied upon the $20,000 which was to go to his wife,
who survived him.     Defendant E. H. Lougee was ap-
pointed special administrator of the decedent's estate in
this state, and this estate was duly administered upon
and closed here.     During the lifetime of the senior Doug-
lass the lands were not for sale; but upon his death de-
fendants not only sought a continuance of their agency
for the renting and handling of the lands, but also en-
deavored to secure an agency for the sale thereof.     They
were successful in securing an agency for collecting the
rents of all the lands, except those in Shelby County,
but never procured an agency for the sale thereof.     They
did, however, purchase the interest of five of the seven
heirs of the senior Douglass as follows:· From Mary
McE. Fay, August 24, 1900, for the sum of $13,000;
from William A. Douglass, September 7, 1900, for the
sum of $12,000; from Robert D. Douglass, September 8,
1900, for the sum of $12,000; from George Douglass, Sep-
tember 14, 1900, for the sum of $12,500; from Benjamin
Douglass, Jr., September 14, 1900, for the sum of $12,000.
Negotiations for these several interests, save that of Mrs.
Fay, were concluded in New York City, August 31, 1900.
The share of another heir, to wit, Charles H. Douglass,
was acquired by one J. J. Raver, who, in May, 1900,
began an action of partition against all the other owners.
The other share, or the one belonging to Frank M. Doug-
lass, was acquired by one J. P. Hess, as trustee for Day
& Hess, about September 10, 1900, for the sum of
$14,000.     After the commencement of the partition suit
hitherto mentioned, Hess acquired the interest of Raver,
and he was thereafter substituted as plaintiff in the ac-
tion, and defendants, who had acquired the interests of
five of the heirs, were substituted as defendants.     Other
persons representing lienholders intervened in the action,
and the case went to decree October 10, 1900, confirming

the shares of each of the parties, ordering a sale of the lands at prices fixed in a schedule agreed upon by the parties, and F. J. Day and E. H. Lougee were appointed referees to sell the land. The lands were all sold by these referees for the aggregate sum of $147,404.30; the first tract being sold on September 11, 1900, and the last on April 11, 1902. On January 10, 1901, lands to the amount of $54,100 had been sold, although these sales were not all for cash, and the final report of the referees was not made until December 17, 1903, at which time a final accounting was had and the entire matter closed up. There was realized from the personal estate of the decedent $8,389.87, and this was applied upon the legacy of $20,000 to the wife, Louise Douglass; the balance of $11,375.74 being paid to her by the referees. They also took care of the $10,000 trust fund created by the deed of the senior Douglass. In addition to being agents for the senior Douglass with reference to the handling of the lands, as hitherto stated, defendants looked after certain litigation which he had in the courts of Pottawattamie County, and their relations and dealings with him are in no manner complained of.

Plaintiff, who represents himself and four other heirs of the senior Douglass, brought this action to compel the defendants to account for five-sevenths of the proceeds of all the lands, upon the theory that they were agents for him and the parties whom he represents, and as such should account to him for all profits made by them on the deal. It is contended that they did not act in good faith, but, on the contrary, falsely and fraudulently misrepresented the value of the lands which they purchased, and covinously withheld certain information, which they possessed as agents, which they should have imparted to plaintiff and his assignors, their principals. It is claimed that defendants represented the lands to be worth from $25 to $30 per acre, whereas in truth and in fact they

were worth from $30 to $55 and that defendants had offers upon parcels of the land, which they concealed from the plaintiff and his assignors. He asked judgment for the sum of $35,000. The defendants' answer was in substance a general denial, and by cross-petition they asked judgment for the sum of $7,570 against the plaintiff, due to the fact that he fraudulently converted to his own use that amount of property, for which defendants should have had credit on the legacy to Mrs. Douglass, the widow. This property consisted of some real estate in the city of Santa Barbara, Cal., which is claimed belonged to the senior Douglass, the proceeds or value of which should have been credited upon the legacy to Mrs. Douglass, but which was in fact received by plaintiff and the other heirs and converted to their own use. The trial court denied plaintiff the relief asked, and also dismissed the cross-petition. Both parties appeal; but, as plaintiff first perfected his appeal, he will be called "appellant."

There is not much dispute in the testimony, save as to the value of the lands at the time defendants purchased their interests; and the law is very well settled.

1. Principal and agent: duty of agent when purchasing principal's property on his own account: fraud: evidence. Save as to the Shelby County land, defendants were at one time agents for the handling and renting thereof, but they never were agents for the sale thereof. They tried to secure the agency, but in this they failed.

The general rule of law as to purchases by agents who have authority to sell is thus stated in *Green v. Peeso*, 92 Iowa, 261:

While it is true that an agent for the sale of property may, with his principal's consent, purchase the subject-matter of the agency, where the facts are fully disclosed, and the agent acts in good faith, taking no advantage of his situation, yet a court of equity, on grounds of public policy, will, nevertheless, subject the sale to the severest scrutiny. 'Its purpose will be to see that the

agent, by reason of the confidence reposed in him, secures no advantage from the contract.' 'When the transaction is seasonably challenged, a presumption of invalidity arises, and the agent then assumes the burden of making it affirmatively appear that he dealt fairly, and in the strictest of faith imparted to his principal all the information concerning the property possessed by him. The confidential relation and the transaction having been shown, the *onus* is upon the agent to show that the bargain was fair and equitable, that he gave all the advice in his knowledge pertaining to the subject of the sale and the value of the property, and that there was no suppression or concealment which might have influenced the conduct of the principal.'

Again in *Ingle v. Hartman,* 37 Iowa, 274, it is said: "And when he proposed himself to become the purchaser, and thus to place himself in a position in which his judgment might be biased by his interest, it became incumbent upon him to furnish exact and truthful information as to everything affecting the value of the land." There can be no reasonable doubt as to this rule where the agency is one to sell. If, however, the agency is not to sell, but to handle the property in some other manner, as to lease it or collect the rents, and the agent enters into independent negotiations with his principal for the purchase of the land, we see no reason for attaching any suspicion to the transaction from that fact alone. In such circumstances he is under no obligation to assist the principal in obtaining the highest price he can. On the contrary, from the moment he attempts to buy, the parties are at arm's length, and it is the buyer's right to obtain the property for the least sum he can, without aiding the seller, to whom, with reference to such sale, he is under no obligations whatever. See *Collar v. Ford,* 45 Iowa, 331.

The nature of the agency should be considered in arriving at the duties which either of the parties owes to the other. If the agency be to sell, then the strict

rule first quoted applies. If the agency be to lease and collect rents, and not to sell, and the agent enters into negotiations to purchase, and makes no false or fraudulent representations or concealments, then his purchase is as good as if he had bought from a perfect stranger. This is pointed out in the cases cited, and in *Smith v. Dell*, 30 Iowa, 594. In so far as shown, defendants were under no obligation to inform plaintiff as to the value of the lands, or to communicate any offers which might be made therefor, except as such information might bear upon the rental value or the amount of income from the lands. Their agency for the deceased terminated with his death, and they were never agents to sell, or even to lease, after the death of the senior Douglass. At the time of their appointment as agents for plaintiff and his assignors they had nothing to do save to collect the rentals for lands, which had already been rented for the farming season, which was then well advanced. They were unable to procure an agency to sell; but they did inform the heirs as to certain offers which had been made upon the lands. These will be pointed out more at length as we proceed.

In a letter dated April 23, 1900, which was before the death of Douglass, Sr., defendants wrote plaintiff as follows:

Replying to your letter of the 20th inst., would say that Mr. C. H. Douglass has already commenced suit in the district court in this county to have the deeds given by him set aside. The three thousand one hundred and fifty acres deeds are due as follows, to wit: Pottawattamie County, County, one thousand four hundred acres, worth $40 to $45 an acre; Mills County, six hundred acres, worth $40 to $45 an acre; Shelby County, nine hundred and ten acres, worth about $35 an acre; Harrison County, two hundred and forty acres, worth $30 an acre. Sheriff's deeds are due as follows, to wit: Pottawattamie County, June 12th; Mills County, June 22d; Shelby County,

October 10th; Harrison County, November 28th. Sales may be redeemed separately.

Again, on July 21, 1900, they wrote him the following, among other things:

Have been told to-day that the partition suit will be dropped; this would · indicate that Mr. Hess is willing to unite with you in the sale of the lands. Can you advise us now whether the lands will be put on the market this fall? We can sell a small part of it as soon as you are ready, as we have already had calls for it. If you expect to sell the land in a body, we should like a chance to bid on it; and, if it is to be sold by you in parcels, we hope to act as your agent in this matter. We write you in regard to the matter now, as we are inclined to think that others may attempt to control it.

On July 23d they wrote:

Flickinger Bros. tell us that they wrote you yesterday fully in regard to the attitude of Mr. Hess in the matter of the partition suit. We understand that they are anxious to dispose of the land to the best possible advantage; and, as you seem to be of the same mind, we presume you will be ready to entertain offers for the various tracts. There is one eighty that we think we can sell for $50 to an adjoining landowner.

On July 26th they wrote:

We thank you for your letter of the 24th inst., just received. We thought that possibly Day & Hess might try to get to handle the land for you, inasmuch as they now own an interest in it. The land would probably bring about $100,000 if sold in lump; while it can be sold in parcels to aggregate $120,000. This is allowing that the land in this and Mills Counties will bring about $40 an acre and the land in Shelby and Harrison Counties $30 per acre. We had a call this morning from a man who wishes to buy one hundred and twenty acres adjoining his farm, and we told him that we would probably be able to make him a price in about a month.

On July 30th they wrote saying, among other things:

We think it only fair to us that we should be allowed to handle these lands for the heirs, and believe that your interests would be better protected in our hands. We have this day written to all of the heirs concerning this matter, and trust it is not too late for the sale of the lands to be placed in our hands. Anything you can do for us in this matter will be very much appreciated.

Again on August 8th they wrote, among other things, the following:

After writing you July 30th, I went to Chicago, Milwaukee, and St. Paul to see your brothers, thinking that probably Mr. Day was endeavoring to negotiate with them direct to represent their interests here. I found F. M. Douglass out of the city, but his brothers in Milwaukee and Chicago stated to me that they understood the land was in our charge; that they had never heard of the firm of Day & Hess, and, so far as they were concerned, had on desire whatever to make any change in their representatives here; but that the matter would be referred to your judgment, as you were familiar with it all. I was very glad of the assurance, as I felt that if the matter was left to you we had nothing to fear. . . . The tenants are very anxious to know whether or not the land will be sold, or whether they will be allowed to remain. One of them, who rents two hundred and forty acres, called this morning, and wishes to know as early as possible. We can sell this particular farm to one of the neighbors at a good price, if authorized. We have an offer of $50 per acre cash for eighty acres in this county. This is a good stiff price, and the land ought to be sold. What can or shall we do in the matter? . . . Are we at liberty to enter into a contract for- the sale of any of the land, if we received a good offer and can agree with Mr. Hess as to a price?

On August 11th they wrote:

We have an offer of $50 per acre for two hundred

and fifty acres. This price is the very top and is a liberal price, and we are able to secure such an offer through the fact that the party owns the adjoining farm. He wishes to know as early as possible. We see no reason why the sale of the property could not be closed at once, if agreeable to you. We could submit the matter to Mr. Day to have him agree to the price, and we could then hold the proceeds for distribution at the proper time, or they could be deposited in any bank here in the city, if more satisfactory to Mr. Day.

On August 20th B. Douglass wrote defendants as follows: "When we are ready to sell, I think that you will have no difficulty in receiving the appointment from the entire Douglass interest. That is the result of my correspondence with the other members of the family."

Again on August 21st they said:

We have your telegram of the 20th inst., which reads: 'If you will offer $13,000, each heir, will try to induce them to accept?' We hardly know how to answer you. We have written to a number of your brothers, as well as to Mrs. Fay, offering $12,000 for each share. Did not expect to be able to buy them all, nor did we care to. Our idea was that, should we own a one-seventh interest, as Day & Hess do, we would be in a better position to retain control of the land, and would have equal rights with them, in addition to which we felt that there was every reason why you should wish us to act as your agents. As before written you, we have made promises to a great many of the tenants and others, with reference to this land, that the land would be for sale this fall, and would be sold through us. We also promised others that as soon as the land was for sale, we would notify them and give them an opportunity of purchasing it. We felt very anxious to be able to keep our promises, and when we received a letter from Mrs. Fay offering to take $14,000 for her interest, we represented that we would pay her $13,000. At the same time we felt that we offered a little more than we were justified in doing, and that we would not want to offer that much for each of the shares. We felt that in making the offer of $12,000,

which we did make a few days ago with a view of buying but one, as we explained, we would be giving about all that could be realized for that interest in the land. Out of the three thousand one hundred and fifty acres, we can figure on about twelve hundred that we feel certain that we can sell in a short time. These twelve hundred acres are among the best and most desirable of the lands. A part of the land, especially the Shelby and Harrison County land, will drag along for some time, and can not be sold at anything like a good price. Mr. Korth writes us that the Shelby County land is worth $25 to $35 per acre. This will be a large deal, and one which you will realize is quite difficult for such as us to handle, as we would have to arrange to borrow the greater part of the money, and we are not certain as to whether or not we will be able to pay all cash or not. We are certain that we could pay $40,000 to $50,000 down, give a mortgage for the balance, payable on or before, five percent, stipulating that any part of the land would be released upon the payment of a certain price per acre. The mortgage would not then interfere with the sale. If we should sell some twelve hundred acres soon, we ought to be able to pay you all in the course of a few months. We will make you the following proposition: We will pay $12,500 to each of the heirs, except Mrs. Fay, to whom we have agreed to pay $13,000 for reasons which we have stated, providing we can make the arrangements for paying the same. We feel that this offer is a liberal one, as it is net to you, saving any further trouble in the matter of expense on mortgages or abstracts. We have tried to be perfectly frank, fair, and liberal with you in all of our dealings, and have given you from time to time the best information we had as to the true values of the land, not trying to hold values down in your eyes with any view of purchasing it ourselves. To sell the land will require a great deal of time, work, and energy; and we ought to be entitled to some profit, although it will be small, on the offer we have made you. Please wire us on receipt of this letter what you will recommend in the matter, so that we may make arrangements for the necessary funds in case the deal is consummated. You will remember that we hold about $5,000 in our hands which belongs to the estate.

On August 22d they wrote:

We have your favor of the 20th inst., for which we thank you very much. The matter seems to have adjusted itself, as we felt that it must in the end; and yet we could not help but feel more or less uneasy on account of the representations made by Mr. Day, as we were not able to communicate with you, owing to your absence from New York. We wrote you yesterday in regard to the purchase of the land and are awaiting your reply. We believe that we can make arrangements for the payment all right, in case you desire to accept our offer. In case we purchase, there are some matters that we would need to adjust with you, and think it advisable for one of us to come to New York for that purpose. As we wrote you yesterday, we feel that we have made a very liberal offer, and believe that there would be no advantage to the heirs in disposing of the property otherwise.

Plaintiff, in response to this letter, said:

I am in receipt of your favor of August 22d. I hardly think it will be necessary for any one to come to New York, but if you so desire, I shall be very glad to see you. There will be no necessity for any one coming until after we submit the offer you make to the other heirs and have obtained their acceptance or rejection. That will probably be in the course of a week or ten days. I wrote to all of them yesterday, and it may be that they will conclude not to accept. As soon as I hear from them I will advise you. The fact that you pay Mrs. Fay a little more than the rest may embarrass me. As you know, Flickinger Bros. are our counsel in Council Bluffs, and it appears to me that it will be advisable for them to look after all the legal matters relating to the settlement, provided it is consummated. Do you think there would be any objections to my notifying them of the offer you have made?

Again on August 27th they said:

Your favor of the 25th is at hand. I think it better that I should come to New York and talk matters over

with you. Shall leave home to-night. Shall stop and see your brother in Chicago and may run up to Milwaukee. I prefer that you say nothing to Flickinger Bros. yet for reasons that I will explain to you when I reach New York.

On July 30, 1900, defendants wrote a letter to Robert B. Douglass, which contained the following, among other statements:

For two years past we acted as agents for your father in rental and care of the lands in this state. We did so at one-half the regular commission for such work, on a statement made by your father that when the land was placed in the market for sale, we would undoubtedly have the handling of it and make a commission. . . . As you are aware, the interest of C. H. Douglass has passed by foreclosure and is now owned by J. P. Hess, trustee, of the firm of Day & Hess. Day called on all the tenants, notified them that their leases would terminate March 1st, that the land was for sale, and that if they wanted longer, they must purchase it. Day said they had been appointed agents, with powers of attorney on the road. This is a great surprise to us, as we had received a letter from B. Douglass, Jr., dated July 24th, in which he said: 'As I formerly wrote, if I am elected to select any agent for the sale of the property, I know of no one that would please me better than you.' We have not corresponded with any of the heirs in regard to their property except Mr. F. M. Douglass and Benjamin Douglass, Jr., as they were appointed executors of your father's estate, had been there, were familiar with all of the circumstances, and supposed their recommendation would have considerable weight with the balance. We can hardly believe that Mr. Day has correctly represented the matter to us, as Mr. B. Douglass, Jr., has a number of times assured us that, so far as he was concerned, we would have the sale of the lands. We are probably more familiar with the conditions and values of this property than anybody else here, inasmuch as we have visited it a number of times during the past two years. It seems to us entirely unfair that Day & Hess should act as the agent in the sale of this property simply because they control a one-seventh

interest, and think it is due to us that we should act for you in this matter. We have had calls for a number of pieces of the land, and are prepared to sell as soon as it is placed upon the market.

On August 4th they wrote William A. Douglass, and stated these, among other things:

On my way home it occurred to me that I might be able to purchase the one-seventh interest owned by Mr. Hess myself. . . . I do not think Mr. Hess would sell it to me, but might to one of your family. Will you write to him, asking him what he would accept for his interest? If I can buy him out, it will do away with any trouble in selling the lands, and will assist in expediting matters.

On August 25th defendants wrote a letter to W. A. Douglass in which, among other things, they stated:

We have made a very liberal offer, which we believe it will be to your interest to accept.

On September 6th they wrote:

In regard to the profits that we may make on the sale of these lands, will say that they will represent a great deal of hard work that has already been done during the past two years, and what we will have to do in the next two years. It has been anything but a bed of roses to handle this business, we can assure you. Please execute and return the deed as soon as convenient.

Again on September 15th they stated to W. A. Douglass, in a letter under that date:

We have just sold two hundred and forty acres in this county for $13,200. The purchaser owns one hundred and twenty acres of well-improved land adjoining this, and he puts in the three hundred and sixty acres for a loan of $10,000, running five years at five percent. Would you like to have this loan as an investment?

One of defendants went to New York to interview plaintiff, and while there dictated the following offer for the interests of the various heirs in the property:

New York, August 31, 1900.  We submit the following proposition for the purchase of the undivided five-sevenths interest owned by W. A. George, Frank M., Benjamin, Jr., and R. D. Douglass in lands in Pottawattamie, Mills, Shelby, and Harrison Counties, Iowa, being the land deeded to them by their father, Benjamin Douglass: We will pay for said undivided five-sevenths interest $62,500, and assume two liens now of record against said land, aggregating $30,000, less the amount of the net assets of the estate of B. Douglass, deceased, which said assets you are to agree shall not be less than $5,000.  When the deed to said land has been executed, will pay the sum of $25,000 in cash, which shall be applied with $5,000 to be advanced in the sale of said liens for $30,000; the executors of the estate of B. Douglass, deceased, to enter into contract to pay over to us at the closing of the estate the full amount of the net assets of the estate of the said B. Douglass, less $5,000, as above suggested.  For balance of purchase price, will execute first mortgage on or before one year, five percent interest, containing stipulation that any parcel or part of said land will be released upon the payment of $30 per acre for the land.  Possession of the land to be given as of March 1, 1900.  It is our intention to at once enter into contracts for the sale of this land, and to close sales as soon as you are able to give clear title.  It is our impression that we will be able to pay an additional twenty or twenty-five thousand for sales of the land by the time you are ready to deliver deeds.  This offer to stand until September 10, 1900.  [Signed] Lougee & Lougee.

The preponderance of the testimony shows that at various times defendants orally represented that the property, if sold in bulk, was worth $100,000, and if sold in small tracts or parcels to suit the purchaser, it was worth $120,000.  In the first letter the values were fixed at approximately from $119,000 to $129,000, and in a letter

of June 15th the value of Chas. H. Douglass' interest is fixed at $15,000, less liens. These values were fixed when defendants were seeking to become agnts for the sale of the lands. There is no doubt that they advised plaintiff, or his assignors as to all offers they had for the lands, or any part thereof, and there is no suggestion of any concealment on their part. Plaintiffs, or some of them, were negotiating with others for the sale of the lands. Plaintiff and some of his assignors are experienced business men. They are connected with the well-known commercial agency of R. G. Dun & Co., and not novices in business or unaware of the ways of the world. They had the matter of sale under consideration for some time, but never made defendants their agents for the sale of the lands. True, they say that they relied upon defendants' estimates as to the value of the property, and that it was in fact worth much more than it was represented to be. They were aware, however, that defendants were buying the land for speculative purposes, and that if they bought the same *en masse,* they expected to make at least $20,000 on it. They were not deceived as to offers that had been made the defendants while they were agents for the collection of the rents, and it is not shown that defendants withheld any information which came to them, save what was generally known regarding the upward tendency of prices for land in this and adjoining states, commencing about the year 1900. True, defendants showed anxiety to get an agency for the sale of the lands, and latterly became especially anxious to buy because others were acquiring interests in the property; but this was apparent to the defendants, and if any suspicion is to be attached to this haste, plaintiffs were fully advised thereof. The preponderance of the testimony from men who are acquainted with land values at the time indicates that defendants' estimates as to values was not far out of the way. That these statements were regarded as estimates

is plainly apparent from the correspondence which passed between the parties. There is nothing to indicate that plaintiff or his assignors were placing any particular confidence in the statements made by defendants as to values. Others were trying to secure their interests, and offers had been made them therefor.

In all matters relating to the subject-matter of the agency defendants were required to exercise the utmost good faith. Loyalty and fair dealing are duties which an agent owes to his principal, and he can not use his agency for his own profit. But an agent to lease may enter into negotiations for, and become the purchaser of, property which is the subject of the agency, provided he does not use his position as a means to that end, and makes full disclosure of all matters which the principal is entitled to know because of the relations between them. The nature of the agency is material as bearing upon the duty which the agent owes to his superior. Thus an agent to sell can not, for various reasons, become the purchaser at his own sale. · The law will not allow him to act in both capacities; but an agent to collect rents or to lease may buy the property from his principal, provided he takes no advantage of his relation, and the principal is advised of all matters which it is the agent's duty to communicate. If the agency is such that the agent is not expected or required to advise his principal as to the value of the lands, and the principal refuses to confer upon the agent the power of sale, but the agent, without fraud, enters into negotiations for the purchase of the lands, there is no reason, either in law or morals, why he can not purchase the property just as a stranger might do. If any trust or confidence is reposed in the agent, and the relations are such as to call for disclosures as to offers for or values placed upon the property, then an agent, who himself becomes a purchaser, has the *onus* of

showing · that he made full disclosures and took no ad-
vantage of his situation.

At one time defendants were called upon for a state-
ment regarding the values of the land. To this they re-
sponded as shown in the first letter quoted. No one con-
tends that the values were materially underestimated in
this letter. When they entered into negotiations for the
purchase of the property, they did not place the values
so high. Rather than being an evidence of fraud, this
is simply a manifestation of a trait of human nature
with which all persons who know of the ways of the world
are familiar. It is true that within a few days after de-
fendants secured their interest they, in conjunction with
the other owners of the land, fixed a much higher price
upon the land for selling purposes than they had esti-
mated it was worth when they were negotiating for its
purchase from plaintiff and his assignors; but this is not
in itself evidence of fraud or deceit. Defendants were
buying the land to sell for a profit, and the estimates
made were the outside prices. Either of the owners was
authorized to sell for $5 per acre less than the estimate.
It is also true that defendants made a snug sum on their
investment, but this was largely due to the rapid increase
in land values from the time of their purchase down to
the time of sale. Doubtless since these sales were made
the purchasers have profited from their investments quite
as much as defendants did from theirs. Vast sums of
money have been made in real estate during the past eight
or nine years, and no one ten years ago had the prescience
to know of this advance.

Defendants were never agents in any way for the
Shelby County lands, and they never had anything to do
with them until they purchased an interest therein. Plain-
tiff had another agent for these. Yet upon these lands
defendants made quite as much as upon their other pur-
chases. Even were defendants required to make a show-

ing of absolute good faith and fair dealing, we should be inclined to hold that they had done so, and that under all the circumstances disclosed their purchases were and are fair and equitable.

The case is peculiar, however, in that plaintiff and some of his assignors are shrewd and capable business men. They had close connection with representatives of the great mercantile agency of R. G. Dun & Co., and could easily have informed themselves regarding the values of the land. Some of the heirs of the senior Douglass had seen part of the lands at least, and had undertaken to find out its value before the sales were made to defendants. They did not indicate, save in a letter written before the death of the senior Douglass, that they were relying upon defendants' statements as to the value of the lands. In response to their inquiries defendants, who were not then in the attitude of purchasers, furnished them a statement as to values which is not challenged. It was not for some months thereafter, and not until others were acquiring interests in the property, that defendants undertook to buy. Naturally they then wished to buy as cheaply as they could, and there is nothing from that time forward indicating that plaintiff, or his assignors, were depending upon them in any manner. So far as shown, from the time of defendants' first attempt to buy, down to the time of sale, the parties were "at arm's length," and no reason is suggested why defendants could not buy the property or plaintiff's interest therein.

The only suggestion made here is one of law, and that is that the transaction, having been seasonably challenged, is presumptively fraudulent, and the burden is upon defendants to show good faith and fair dealing. The rule is not quite so broad as stated by appellant. Much, of course, depends upon the nature of the agency and the degree of confidence and trust reposed in the agent. If the agency is to sell, and the agent is himself

the buyer, there is no doubt about the rule being as contended for appellant. But if the agency is for another purpose, and the purchase is quite outside any of the duties of the agency, then another rule applies. At most defendants, after the death of the senior Douglass, were agents for his executors in the collection of rents accruing before his death, and agents for the heirs in the collection of the rents accruing after that time. They never made any leases under that agency, nor were they authorized or requested so to do. They undertook to buy the property from the heirs in competition with others, and were successful. Even were they required to show good faith, equity, and fair dealing, we should be constrained to hold that they had done so; but, under the facts disclosed, we are constrained to hold that the parties were dealing with each other at arm's length, and that defendants were not guilty of any actionable fraud. It appears from the record that two of the heirs, or one of them and the grantee of another, sold their interests to strangers to this litigation. One for $14,000, and the other for less than $12,000. This is indicative, not only of the value of the land, but shows that plaintiff and his assignors had information, in addition to that received from defendants, regarding the value of their interests in the land, and some of them had an opportunity to buy up one of these interests for a less amount than they received from defendants. The trial court gave the case patient consideration, and its finding must, of course, be given some weight. Some of the witnesses were before that court, and it had advantages which we do not possess.

II. As to defendants' appeal. They claim that they are entitled to judgment for five-sevenths of the value of the Santa Barbara, Cal., real estate, or five-sevenths of the amount received therefor, on the theory that they assumed the liens or trusts upon the property purchased by them in this state

2. ESTATES OF DECEDENTS: legacies: satisfaction.

subject to a deduction of the amount of the other assets belonging to the decedent, Benjamin Douglass, Sr. They claim that among these assets was the Santa Barbara real estate, the proceeds of which they are entitled to. We can not agree to this proposition. Doubtless, if this property, or the proceeds thereof, were a part of the assets of Benjamin Douglass, Sr.'s, estate there might be something in defendants' present claim. This property was conveyed by the senior Douglass to plaintiff as trustee for the several heirs, subject to a life estate. The property was sold by the trustee, after the death of the grantor, for $10,597.-54, and the proceeds were divided among the beneficiaries under the deed. The deed conveying the Iowa property to plaintiff and the other heirs of the senior Douglass contained this provision:

The above-described real property is hereby charged with, and this conveyance is made subject to said charges—1st. The payment upon the death of the said Benjamin Douglass, one of the parties of the first part hereto, to said Louise Douglass, the other of said parties of the first part, in the event of his, the said Benjamin Douglass, dying before the said Louise Douglass, and there are not sufficient assets of his estate to pay the same, of a legacy of $20,000 which the said Benjamin Douglass, by his last will and testament had given to said Louise Douglass.

On the following day the deed to the Santa Barbara property was made to plaintiff as trustee, and plaintiff executed, delivered, and had recorded a declaration of trust reading as follows:

To all whom these Presents shall come—Greeting: Whereas, Benjamin Douglass and Louise Douglass, his wife, of the city and county of Santa Barbara, Cal., have granted and conveyed to me in fee simple for a consideration of ten dollars, by deed date of the 30th day of September, 1897, the following described lots and parcels of land, to wit: [here follows description of Santa Barbara home-

stead.]   Now, know ye, that I, the said Benjamin Douglass, Jr., make known and declare that the said premises were conveyed to me in trust for George Douglass, Robert Dun Douglass, William Angus Douglass, Benjamin Douglass, Jr., Frank Middleton Douglass, Mrs. Charles Howard Douglass, and Mrs. Mary Douglass Fay, share and share alike.  In witness whereof, I have hereunto set my hand and seal the 8th day of November, 1897.  [Signed] Benjamin Douglass, Jr.

These transactions amounted to a complete disposition of the Santa Barbara property, and the senior Douglass had nothing left therein, save a life estate.   The instruments were none of them testamentary in character, but passed a present interest in and to the land.   Upon the death of the senior Douglass there was nothing left in this California property for his estate.   No part of the proceeds should have been applied upon the payment of the legacy to the wife.   Moreover, this matter seems to have been fully adjudicated in the California courts, and the matter can not be reviewed here.

No error appears, and the judgment on both appeals must be, and it is, *affirmed*.