KATHRYN E. MILES, Appellee, v. H. T. LYNCH et al., Appellants.

**FRAUD:**   Fraudulent Representations—Assumed Fiduciary Relation.
Evidence reviewed, and held sufficient to establish fraud in a contract of purchase of a farm, in that the defendant had, with sinister intent to overreach plaintiff, voluntarily assumed a fiduciary relation to her, and by reason of such relation had deceived her.

DE GRAFF, J., dissents.

*Appeal from Bremer District Court.*—C. H. KELLEY, Judge.

APRIL 5, 1921.

SUIT in equity to set aside an executory contract for the sale of land, on the ground of fraud and undue influence. There was a decree for the plaintiff, and the defendants appeal.—*Affirmed.*

*E. R. O'Brien* and *E. A. Sager,* for appellants.

*J. R. Bane,* for appellee.

EVANS, C. J.—The contract under attack was signed by the plaintiff on January 11, 1919. By such contract the plaintiff bound herself to convey to the defendants on March 1, 1920, an improved farm of 310 acres in Bremer County, for a consideration of $39,000. One thousand dollars of the consideration was paid at the time of the execution of the contract. The contract was, in fact, a very advantageous one for the defendants. The crucial question in the case is whether the defendant Schaum, who was the sole representative of all the defendants in the preliminary transaction, obtained the execution of the contract from the plaintiff by fraudulent pretense. The determination

of this question of fact involves also the question whether any fiduciary relation existed between the plaintiff and Schaum, and to what extent such relation existed. Schaum was concededly the agent of the plaintiff for the purpose of the management of this farm in the matter of renting the same and dealing with the renters. Such management of the farm comprised substantially all the business the plaintiff had. Such management was in the line of Schaum's business. He conducted a real estate office at Oelwein. The plaintiff was a resident of Oelwein. She had never listed the farm for sale with Schaum, in any formal sense. The contention for Schaum is that, inasmuch as he was the agent of the plaintiff for the renting and management of the farm only, and as it had never been listed with him for sale, he sustained no fiduciary relation to the plaintiff in respect to the sale of the farm, as distinguished from the renting thereof; and that, in the matter of sale, he was as free to deal with her at arm's length as any other purchaser.

For the plaintiff, it is contended that Schaum voluntarily assumed to aid and advise and represent her in the matter of such sale; and that he intended to gain her trust and confidence thereby; and that he did thereby gain her trust and confidence, as he well knew; and that she executed the contract in question in full reliance upon the good faith of his advice and representations to her,—all of which he well knew at the time.

This brief statement presents the perspective of the case, and we turn to the details of the story. The plaintiff was the widow of P. J. Miles, who died in 1914, seized of the farm in question. She received the farm in the distribution of her husband's estate. She was a woman of ordinary intelligence, with a high school education, and with several years of experience as a teacher before her marriage. She had never had occasion to transact business during the lifetime of her husband. Her brief experience, following the death of her husband, in attempting to manage her farm through tenants, discloses manifest unfitness to that end. At the close of litigation with her first tenant, and pursuant to the advice of her counsel therein, she determined to employ a trusted agent to look after the business. Schaum became that trusted agent. The details of the original employment are related by the plaintiff as follows:

"I met Mr. Schaum one afternoon in front of Dr. Cole's residence. I stopped, and he also, and I think he asked about being agent, * * * and I said, 'Yes;' Mr. O'Brien had recommended him to me and I had not looked for anybody else; but I think I told Mr. O'Brien, when he spoke of it, I had thought of James Fay, a man who was a farmer, and was a good honest man. I thought he might look after it; but when he recommended Mr. Schaum, I thought he should know, and should tell me what was to my interest, and so at this meeting, * * * I told Mr. Schaum I had no other agent secured, and asked him what commission he wanted. He said 5 per cent of all money taken in, and that he would make 3 or 4 or 5 trips to the farm to look after things for me. I was up to the office after that, and he said: 'Now, Mrs. Miles, you don't have to look after anything; you don't have to collect rents or look after seeding or anything like that, because I do all those things for my agents, or for my principals.' I don't think he used that word, but that is what it means. He says: 'Why, there is a man at New Hampton,—he never looks after anything. I do everything for him; I collect his rents, and he don't do anything about it; I turn his money over, and that is all there is to it.' "

The foregoing occurred in September, 1917. Shortly thereafter, Schaum rented the farm to Holmes. From that time forth, the plaintiff had a number of conferences with Schaum. She was in poor health, and very nervous and worried. He urged her repeatedly to cast all her cares upon him. He assured her that he would advise her as he would his own mother. He frequently belittled the value of her farm. He urgently advised her to sell it, and not to ask too much for it. She said, on one such occasion: "I do not know how to sell land. I never sold any in my life." Schaum replied: "Let me make the deal for you." This was in the latter part of the year 1918. In the distribution of the estate, three years before, the duly appointed appraisers had fixed the value of the farm at $130 per acre. Schaum had voluntarily advised her that that appraisement was too high. The following excerpts from the testimony of the plaintiff will indicate the general character of her evidence, as bearing upon the question of fiduciary relation.

"I went up one morning to talk about oats, and when I

went into the office, he turned to me and said, 'Mrs. Miles, did you ever figure on what your income would be if you should sell your farm?' and I said, 'No, I never did.' 'Well,' he says, 'I have been figuring it, and I find your income would be much greater if you would sell your land than to keep it and rent it.' I said: 'Oh, is that so? I didn't know that.' 'Yes,' he says, 'I have the paper here,' and he fumbled around in his desk, 'right here some place. I can't find it, but you come in some day and I will show it to you and show you just how much better off you would be.' And I said, 'What is the use bothering with all the trouble I have if I can make more?' He says: 'No, not a bit. Why, there you would have that nice income, and wouldn't have any worry or trouble, every year get your interest, and that is all there would be to it; and this way, it is nothing but worry and trouble all the time.' * * * I told him my attorneys had advised me to take farm lands, as it would be a steady income for me, and I would get rid of paying heavy taxes and paving, and so forth. He said: 'It would be lots better if you sold this farm and had this nice income. Why,' he says, 'now I am just advising you as I would my own mother. I would not think of telling you to do anything that I would not tell her to do.' I relied upon him. He was my agent. I had confided in him. * * * I had a conversation with Mr. Schaum about December 18, 1918. * * * One afternoon, I went to the office, and he turned to me and said, 'I found that paper, Mrs. Miles, I was looking for the other day.' And he laid his hands on it right away. 'I have it here,' he said. I think, before he read from the papers, he said to me: 'Now, Mrs. Miles, what—how much do you want down, if you should sell your farm? How much would you want down?' I said, 'Well, I don't know; would $5,000 be enough?' And he said, 'No, I should say about seven.' 'Well,' I said, 'Now, Mr. Schaum, you see I don't know how to sell land; I never sold any in my life, and I have to depend upon what you tell me.' 'Now, of course,' he said, 'if you sell this farm, the deal would not be closed until a year from the coming March. That would be March, 1920.' * * * He said: 'You would get $1,000 down, and then $6,000 when the deed was signed. Now, I am figuring this at $125 an acre.' I asked him how much the interest would be. He said my income would

be $1,700 a year. 'Why,' he says, 'that is more than your rent; just think of it, how much better off you would be.' * * * He says, 'Now, I am just talking to you like I would to a friend; I am giving you good advice like I would my own mother.' * * * I said, 'I don't have to sell my farm, and I don't know whether it is the best thing for me to do or not.' He said, 'Yes, Mrs. Miles, I think it is the best thing.' * * * And he says, 'Now, I wouldn't say it if I didn't mean it, because I would not tell you anything that I didn't mean, any more than I would my own mother.' * * * And I said, 'Well, maybe I had better see somebody.' * * * He say, 'No, that ain't necessary, Mrs. Miles, because, as I say, I would not deceive you.' * * * He says, 'Well, Mrs. Miles, what would you ask per acre for your farm?' I said, '$128.' * * * He said, 'Yes, I think I could get you $128. I am quite sure I can, Mrs. Miles. Now, the parties who want this farm—I am not buying this farm for myself—the parties who want your farm are Lynch and Young, of Independence. I am not in the deal; maybe I will be later, but I am not now. Now, Mrs. Miles, I suppose you know that there are three classes of farms.' I said, 'No, Mr. Schaum, I didn't.' He says, 'Yes, there are three classes of farms in Iowa,—the first, second, and third. The first-class farms are very few around here, if any. The third class, such as yours, sell for about $125.' This conversation was in the afternoon of December 19th, in his office. * * * He said, 'I will see these parties in Independence and talk with them some time.' * * * Again, Mr. Schaum says,—possibly the evening of the 18th of December, he says: 'Say, I have been to Independence today, and saw those fellows down there. * * * Those fellows down at Independence say they won't give but $125 for your farm; they won't give that for any farm.' "

Much of the foregoing testimony is denied by Schaum, whereby a clear conflict of evidence is presented. The circumstances of the case as a whole, however, strongly corroborate the plaintiff's story, and to the same extent militate against the denial of the defendant. The last conversation above detailed was the last conversation had between the plaintiff and Schaum before the deed was executed. The plaintiff had just returned home from the hospital at Dubuque, where she had been most of the time since September 12, 1918, and where she had under-

gone two or three successive surgical operations. Her ailment
had been diagnosed as a sinus infection. One of the operations
had consisted in the removal of the septum of the nose. She
was still weak, and suffering much discomfort. A few days
thereafter, she went from her home to the town of Lansing,
where she become sick again, and where she remained for some
weeks. The contract of sale which she signed was sent to her
by Schaum to Lansing, where she signed the same, on January
11th. This contract called for a down payment of $1,000 and
for a further payment of $6,000 on March 1, 1920, with a mort-
gage back for the balance, due in 15 years, the sum total to be
paid being $39,000. The plaintiff had previously orally agreed
to the amount of the purchase price and to the installments of
payment. The contract sent to her, however, was formulated in
all its details by Schaum. It was signed by the vendees, includ-
ing Schaum, when it was sent to the plaintiff. She had never
been consulted as to the formulation of the details of the con-
tract. In discharge of the down payment of $1,000, Schaum's
letter contained Liberty bonds to the amount of $1,000, the mar-
ket value of which was about $950. The letter of Schaum con-
tained the following postscript, as his final assurance and invita-
tion to the plaintiff to trust him:

"I will personally guarantee you, Mrs. Miles, this deal will
go through satisfactory to you in every way."

The plaintiff raised no question as to the form in which
the contract was drawn, but fully accepted Schaum's assurances.
She did call his attention to the fact that the Liberty bonds were
not worth par. Schaum replied, conceding the point, and de-
claring it an oversight on his part. He also wrote therein:

"I cannot get the fellows at Independence to give any more
for the farm; but you sign the contracts and return one to me,
and when you come back, I will make up the difference person-
ally of what you have coming."

Inasmuch as Schaum had signed the contract which he had
sent, there could be no occasion for his promising to be *personally*
liable for the shortage in the Liberty bonds, except his desire
to reassure the plaintiff and to command her confidence in his
zeal for her interest. Two days after she signed the contract,
the plaintiff left for California, where she remained until the

latter part of April. A few days after the contract was signed, Schaum visited the place and talked with the tenant, Holmes. He advised Holmes that he was holding the place at $200 an acre; also, ''he said, if anyone came to look at the place, to have as little to do with them, as I could,—not to have anything to say to them.'' Such was the testimony of Holmes.

The contract as drawn had in it shrewd characteristics, the effect of which would not be readily detected by an inexperienced person. The contract appears to have been drawn upon a blank form, in use by the defendants, which contained an attorney's fee provision, really intended for the benefit of the vendor. This was erased. From the assurances of Schaum, the plaintiff had a right to believe that such erasure was for her benefit, and as a protection to her against the payment of attorneys' fees. The effect of the provision fixing March 1, 1920, as the date of the execution of the contract, instead of March 1, 1919, was to permit the vendees to speculate for 14 months upon the then current rising values of lands, with no further investment than the down payment of $1,000. It is to be said that plaintiff assented to this date. This assent was given, however, in response to Schaum's advice that she sell the land, and to let him ''make the deal.'' Upon the return of the plaintiff from California, she promptly renounced the contract, and demanded of the defendants a rescission thereof. The defendants refusing, she brought her action forthwith. Trial was had thereon, and decree entered in November, 1919. It will be noted that this was three months before the date of performance had arrived.

On the question of value, there is much variance in the testimony of both sides. Lands were rising in value during the period of the great war, and this rise was quickened by the armistice of November 11th. The range of opinion on the question of value runs from $125 to $200 per acre. We are impressed that the fair weight of the evidence shows that the farm was worth, at the time of the signing of the contract, from $150 to $175 per acre.

In the conflict of evidence between plaintiff and Schaum on the question of fiduciary relation, the weight of corroboration is clearly with the plaintiff, and we are constrained to hold her testimony as the nearest approximation to the truth. The fact

that the farm was not listed for sale with Schaum is by no means controlling of the fiduciary relation. He was her agent for such business as she had. True, at the time of his employment, a sal of the farm was not in contemplation. But he voluntarily assumed to broaden the scope of his agency to that of a general adviser. She assented to his assumption, and trusted him as such. He not only knew her confidence in him, but he won it, and he cultivated it with a specific intent to acquire her farm. True, it was a sinister intent, but it was, nevertheless, as effective as any other, to create a fiduciary relation.

He clearly deceived her and overreached her. Her repudiation has been prompt, and the *status quo* undisturbed. The foregoing must be deemed a sufficient discussion of the details of the evidence to indicate its general nature and the general ground upon which we reach our conclusion. It is a more extended discussion of the facts than would ordinarily be warranted in an affirming opinion, were it not for a difference of opinion among ourselves, as indicated by the dissenting opinion filed herewith. It is the conclusion of the majority that the decree below should be affirmed.—*Affirmed*.

WEAVER, PRESTON, STEVENS, ARTHUR, and FAVILLE, JJ., concur.

DE GRAFF, J. (dissenting). The character of the agency in the instant suit, as defined by the parties, is not in question. Defendant Schaum was an agent to lease and collect rents, and not to sell the land in controversy. No actual fraud is pleaded, and the action is not predicated on deceit. To affirm the findings and decree of the trial court, the record must disclose fiduciary relations between the plaintiff and the defendant Schaum. The writer of this dissent is unable to discover that a fiduciary relation existed, or that there was any assumption of agency for sale on the part of Schaum. Plaintiff never listed the farm for sale with Schaum, although it appears that she was desirous of selling it, and had talked with one or two parties relative to sale, and had, in fact, listed same with one William Lang, in the spring of 1918. True, she had conversations with Schaum, during his tenure of office as her agent to lease, but no material misrepre-

sentations were made by him to her that induced the sale. In the last conversation with Schaum, plaintiff stated that she would take $39,000 for the farm, and defined the terms of payment. Shortly thereafter, she went to Lansing, Iowa, and while she was there, defendant Schaum, for himself and on behalf of his copurchasers, prepared the contract of sale, which was sent to the plaintiff at Lansing; and, on January 11, 1919, she went before a notary public and acknowledged same as her voluntary act and deed. The contract was then returned to Schaum, and the initial payment was made. Later, she went to California, where she spent the winter, and returned to Iowa in the month of April. In May, after the marked rise in land values, she made a formal demand upon Schaum and his codefendants, asking for a return of the farm and the cancellation of the contract. This demand was based on the claim that Schaum occupied a fiduciary relationship, and that, at the time of the sale, he failed to disclose facts within his knowledge, relative to the value of said farm. Defendants Lynch and Young had no personal relations or conversations with the plaintiff during the negotiations for the sale, and relied solely upon the arrangements made by Schaum.

The law of this case has been determined and stated many times by the decisions of this court. In the application of the controlling principle, it is necessary to distinguish and differentiate an agency to lease and collect rents from an agency to sell.

An agent for the sale of property may purchase the subject-matter of his agency, but in so doing, he must fairly and fully disclose all the facts, and, in the strictest good faith, impart to his principal all information that would control or have a tendency to influence the conduct of his principal in the sale. It is his duty to secure the highest price possible. It is his duty to inform his principal as to the true value of the land, and to communicate any offers made therefor, and to give his best advice and suggestion in the sale thereof. He occupies a position of confidence, and must bear true allegiance to his principal. If such agent negotiates a sale in which he has a pecuniary interest, and the transaction is reasonably impeached, a presumption of *mala fides* arises, and he has the burden of proof to show affirmatively that he acted fairly, openly, and in good faith.

Since the defendant Schaum was not this kind of an agent, either expressly or impliedly, the duties and obligations inherent in an agency to sell were not owed by Schaum to the plaintiff, and the principle stated finds no application. An agent to lease real estate may purchase from the owner-principal, and no presumption of *mala fides* arises. It is said in *Douglass v. Lougee,* 147 Iowa 406:

"From the moment he attempts to buy, the parties are at arm's length, and it is the buyer's right to obtain the property for the least sum he can, without aiding the seller, to whom, with reference to such sale, he is under no obligations whatever."

Such an agent is under no obligation to assist his principal in securing the highest price possible. He is under no obligation to disclose the true value of the land, if he knows such fact. In brief, he does not occupy a position of confidence in such a relationship.

The freedom of contract is a fundamental principle in our social and industrial life, and, subject to certain limitations, receives the same legal protection as the right of property. In the instant case, defendant Schaum, being an agent to lease land, and none other, was at liberty to negotiate a purchase for himself and others whom he interested in the purchase.

In the opinion of the writer, the evidence fails to give basis for a recovery on the theory of fiduciary relationship, and since no actual fraud is claimed, the petition should have been dismissed and judgment entered in favor of defendants on their cross-petition. The following cases should control the case at bar: *Douglass v. Lougee,* 147 Iowa 406; *Brown & Co. v. Cash,* 165 Iowa 221; *Green v. Peeso,* 92 Iowa 261; *Collar v. Ford,* 45 Iowa 331; *Ingle v. Hartman,* 37 Iowa 274; *Smith v. Dell,* 30 Iowa 594.