EDWARD HARVEY GHIZ, *et al.*

*v.*

NICK SAVAS, *et al.*

(No. 10208)

Submitted April 18, 1950.  Decided June 20, 1950.

Lovins, President, not participating.

*Pauley & Andrews, E. Franklin Pauley, Larry W. Andrews, Hodges, Revercomb & Price, W. Chapman Revercomb, Arthur B. Hodges, Leslie D. Price,* and *W. L. Fugate,* for appellants.

*Estep & Chambers* and *Casto & Wilson,* for appellees.

Riley, Judge:

Edward Harvey Ghiz, Gabriel Harvey Ghiz, and Michael Harvey Ghiz brought this suit in equity in the Circuit Court of Logan County against Nick Savas, O. M. Ayash, and Albert Klele, as individuals, and as partners trading and doing business as Mallory Mercantile Company and as Union Trading Company, and S. A. Ammar, K. A. Ammar, and N. A. Ammar, praying (1) that seven certain deeds, filed as exhibits with plaintiffs' bill of complaint, though absolute conveyances on their faces, be declared mortgages; (2) that the deeds be cancelled, or that the defendants be compelled to reconvey the property embraced therein; (3) that four other deeds and that part of a deed filed as Exhibit 18 with plaintiffs' bill of complaint, as may concern plaintiffs' title, be cancelled as a cloud upon plaintiffs' title; (4) that a decree be entered, compelling the defendants to account for income and proceeds from the property conveyed by said deeds, and pay to the plaintiffs the income derived therefrom from the dates of the deeds to the present time; and (5) that defendants be restrained from disposing of the property, and further that the court appoint a receiver to take charge of the income of the property and hold the same pending the outcome of this suit. From a final decree adjudicating (1) the deeds under attack to be in all respects legal and valid absolute conveyances of the property described therein; (2) denying the relief prayed for in plaintiffs' bill of complaint; and

(3) dismissing plaintiffs' bill of complaint, the plaintiffs prosecute this appeal.

The plaintiffs are three of the sons of Harvey (Habib) Ghiz, designated in the record, and in this opinion, as "Habib Ghiz". The latter died intestate in Logan County in 1924, leaving surviving his widow, Ady Ghiz, and eight sons, the three plaintiffs herein, and Luther, Alexander, Michael, Harvey, Jr., and Theodore Ghiz, all of whom at the time of decedent's death were infants. The decedent's widow died in 1932, leaving surviving said eight sons, four of whom were then under twenty-one years of age. Harvey Ghiz, Jr., died intestate unmarried, and without issue in 1935, survived by his seven brothers as his heirs at law and next of kin.

Habib Ghiz's estate was initially appraised at $176,-545.66, consisting of real estate in the amount of $135,-650.00, and personal property, including $27,000.00 of life insurance payable to his estate appraised at $40,895.66. From the appraisement it appears that the real estate was encumbered by a deed of trust, bearing date, October 8, 1923, in which Habib Ghiz and wife were grantors, to secure notes in the amount of $40,000.00. The real estate consisted of the Aracoma Hotel property in Logan valued in the appraisement at $100,000.00; decedent's home property in Logan, together with house situated on the side thereof, valued at $10,000.00; a right of way across the adjoining property used in connection with the last-mentioned houses, valued at $50.00; decedent's store property in Logan valued at $20,000.00; lot with house thereon adjoining the last-mentioned residence property valued at $2,500.00; lot on hill in Logan valued at $500.00; five lots in Section 5, Oak Hill Addition to the City of Logan, $2,500.00; and two lots in the village of Gilbert, Mingo County, valued at $100.00. This appraisal included a stock of goods, comprised of men's furnishings, etc., valued at $10,929.42, carried in a general store owned and operated by Habib Ghiz at the time of his death. Other personal property in addition to life insurance in the amount of $27,000.00, mentioned above, consisted of an automobile,

a cow, household furniture in the amount of $1,030.00; collectible debts at the store, $897.27; and cash in the amount of $1,038.97.

In 1929, Ady Ghiz Corey, widow of Habib Ghiz, deceased, Luther Ghiz, Gabriel Ghiz, Michael Ghiz, and five minor sons, by L. G. Burns, their guardian, executed a deed of trust to Harris and Jenkins, trustees, to secure a $24,000.00 loan from the Life Insurance Company of Virginia, evidenced by fifteen principal notes, payable to bearer, at the State Planters Bank & Trust Company, said loan hereafter being referred to as "Planter's Bank Loan". Five of said notes, totaling $12,000.00, were signed by Ady Ghiz Corey; five totaling $7,000.00 by Luther Ghiz, and five totaling $5,000.00 by Michael Ghiz. The first in each of the three series of five fell due October 15, 1930, and the fifth, October 15, 1934. The real estate involved was business property in the City of Logan. And in 1934 another deed of trust, covering personal property in the Aracoma Hotel, was executed as additional security. Both deeds of trust were released May 2, 1939, the indebtedness having been paid off.

During the years from 1934 to 1937 plaintiffs each executed one or more deeds, the legal effect of which is involved in this litigation. These deeds purport to convey certain interests of each of the above-named plaintiffs in the estate of their deceased father, Habib Ghiz, as well as several one-sevenths interests in the estate of their deceased brother, Harvey Ghiz, Jr.

The purported conveyances, which plaintiffs seek to have declared mortgages, or cancelled on the ground of fraud are: (1) Deed dated March 28, 1935, from Edward Ghiz to O. M. Ayash, Nick Savas, and Albert Klele, partners as Mallory Mercantile Company, purporting to convey a full one-eighth undivided interest, subject to the life estate of grantor's mother, Ady Ghiz (Corey), in the real estate of which Habib Ghiz died seized; (2) a deed dated January 4, 1934, from Gabriel Ghiz to Union Trading Company, a partnership (consisting of Savas, Ayash

and Klele), purporting to convey a full one-eighth undivided interest, subject to the life estate of Ady Ghiz (Corey) in the real estate of which Habib Ghiz died seized; (3) a quitclaim deed from Gabriel Ghiz to Albert Klele, dated August 26, 1937, purporting to convey all right, title and interest, being a one-eighth undivided interest in certain named real estate, including the Aracoma Hotel, which was inherited by the grantor from his deceased father, Habib Ghiz; (4) a deed from M. H. (Michael) Ghiz to Albert Klele, dated September 16, 1935, purporting to convey a full one-eighth undivided interest in and to all the real estate of which his father, Habib Ghiz, and his mother, Ady Ghiz, had died seized and possessed, the latter property being the home property of Ady Ghiz, situate in Huntington, Cabell County; (5) a deed from Edward Ghiz, dated October 15, 1936, to Savas, Ayash and Klele, purporting to convey the grantor's one-seventh interest of one-eighth of the estate, real and personal, of Habib Ghiz, of which his brother Harvey Ghiz, Jr., died seized; (6) a certain deed dated June 18, 1936, from Gabriel Ghiz to Savas, Ayash and Klele, partners as Mallory Mercantile Company, purporting to convey all of grantor's interest in the estate of his deceased brother, Harvey Ghiz, Jr., being a one-seventh of a one-eighth undivided interest in the estate, both real and personal of which Habib Ghiz died seized and possessed; and (7) a deed from Mike (Michael) Ghiz, dated September 9, 1936, to Savas, Ayash and Klele, partners as Mallory Mercantile Company, purporting to convey one-seventh of a one-eighth interest in the estate of Habib Ghiz, of which grantor's deceased brother, Harvey Ghiz, Jr., died seized and possessed.

The conveyances which the plaintiffs seek to have cancelled as a cloud upon their title are: (1) A deed, dated August 14, 1934, from Savas and wife, Ayash and Klele and wife, the three men being partners and doing business under firm name Union Trading Company, to Georgia Lee D'Armon, purporting to convey a full one-eighth undivided interest (Gabriel's) in and to all the

real estate of which Habib Ghiz died seized and possessed, as well as an undivided one-eighth interest in the home property of the decedent, Ady Ghiz, situate in Huntington; (2) a deed from Georgia Lee D'Armon, dated August 15, 1934, to Albert Klele and Anna Klele, his wife, purporting to transfer the property conveyed to Georgia Lee D'Armon by said deed of August 14, 1934; (3) a deed dated May 12, 1937, by Klele and wife to Savas and Ayash, which, after reciting the dissolution of the partnership of Savas, Ayash and Klele, styled Mallory Mercantile Company, transfers Klele's interest in four several and individual transfers to said partnership from Mike, Edward (two) and Gabriel, the same bearing dates, September 9, 1936, March 28, 1935, October 15, 1936, and June 18, 1936, respectively; (4) a deed dated September 22, 1936, between Albert Klele and wife to S. A. Ammar, purporting to convey a one-fourth undivided interest in all of the real estate of which Habib Ghiz died seized and possessed, and being an undivided one-eighth interest in said real estate conveyed to Albert Klele by Michael Ghiz by the aforesaid deed dated September 16, 1935, and the other undivided one-eighth interest (Gabriel's one-eighth) is the same which was conveyed to Albert Klele by Georgia Lee D'Armon, by the aforesaid deed dated August 15, 1935; and (5) a deed dated July 15, 1940, from S. A. Ammar and wife to K. A. Ammar, S. A. Ammar, and N. A. Ammar, purporting to convey their undivided 82.1% interest in and to the real estate known as the Habib Ghiz estate, purporting to be the same that was conveyed to said S. A. Ammar by the following deeds of conveyance: (a) from Alexander Ghiz and wife, dated March 1, 1939; (b) from Luther Ghiz, et al., dated March 20, 1939; (c) from Louis Ghiz and wife, dated November 20, 1938; (d) from Luther Ghiz and wife, dated May 1, 1937; (e) from Luther Ghiz and wife, dated July 20, 1937; and (f) from Albert Klele and wife, dated September 22, 1936, which deed of July 15, 1940, recites that the parties of the first part convey all their undivided interest in and to the property specified in the aforesaid five deeds of conveyance.

In their bill of complaint, the plaintiffs charge that the several transfers from them to certain of the defendants were made for grossly inadequate considerations, and in circumstances of actual or constructive fraud; that each of the deeds, though absolute on its face, was, in fact, a mortgage; that the several amounts defendants paid to the several grantees were to be repaid out of plaintiffs' respective shares from the income of their father's estate; and that the property so transferred was to be reconveyed to them after the advancements had been satisfied from the said estate. It is further charged in the bill of complaint that the income from the estate of plaintiffs' father's estate was sufficient to pay the said advancements; that defendants, Savas, Ayash and Klele, have refused to reconvey to plaintiffs their 24/56 interests in their father's estate, and that they have attempted to transfer to the defendants the greater portion of such interest to defendants, S. A. Ammar, K. A. Ammar, and N. A. Ammar.

The bill of complaint further charges that Edward and Gabriel Ghiz relied upon the promise of Albert Klele, who was their mother's brother, to reconvey the property until the year 1937, when Klele is alleged to have repudiated his promise; that Edward Ghiz joined the armed forces of the United States in 1940, and Gabriel Ghiz in 1941. Michael Ghiz relied upon Klele's promise, it is alleged, and later on the promise of S. A. Ammar to reconvey and awaited the return of his brothers from World War II before bringing this suit.

After the death of Habib Ghiz, the estate was administered by L. G. Burns from 1924 to 1930, as administrator of the estate of Habib Ghiz and as guardian of the infant children. On October 1, 1930, Burns was succeeded by Sam Ghiz, decedent's brother, who resigned on July 25, 1932. On August 10, 1932, defendant, Albert Klele, was appointed guardian of the then four infant children of Habib Ghiz, and by an instrument, dated August 15, 1932, was constituted agent to look after the interests of the three plaintiffs, and Luther, all four being of age at that time.

The settlement of the accounts of Albert Klele, as agent for Michael Ghiz, Luther Ghiz, Gabriel Ghiz, Edward Ghiz, and Alexander Ghiz, and the management of the estates of their father and mother submitted to the commissioner of accounts on July 13, 1934, covering the period July 1, 1933, to June 30, 1934, shows a balance of net income on June 30, 1934, of $7,110.64. On that date the account showed an overdraft against Michael Ghiz in the amount of $2,768.00; against Luther Ghiz, $1,818.23; against Gabriel Ghiz, $879.80; against Edward Ghiz, $1,682.70; and as to Alexander Ghiz there was a balance on hand of $1,995.63.

The first of the documents sought to be set aside or declared a mortgage was the deed of Gabriel Ghiz to Union Trading Company, dated January 4, 1934, denominated "This Deed". It recited a consideration of $3,250.00, of which $800.00 was "cash in hand paid, the receipt whereof is hereby acknowledged", an installment of $200.00, being payable on August 15, 1934, and four installments of $562.50 each, payable in one, two, three and four years, respectively, after date, evidenced by four nonnegotiable, noninterest bearing promissory notes. Gabriel Ghiz testified that he had received only $500.00 of the above-recited cash consideration; that Savas, one of the partners in Union Trading Company, retained $300.00 thereof for interest; and that when he attempted to collect money some time later on the four $562.50 notes, he was unable to get the full value thereof. He testified that he went to Savas on Klele's advice; that witness thought he was executing a mortgage on his one-eighth interest; and that he executed the instrument only on Klele's assertion that the property was security for the amount received. Savas, on the contrary, testified that Gabriel Ghiz's one-eighth share was purchased for $1,500.00, and the assumption of an overdraft in the amount of $879.89. When Klele was notified of the conveyance, he, according to Savas, stated he did not like to see the boys sell their interests, and the property was bought back by Klele by deeds from Union Trading Company to Georgia Lee D'Armon and

Georgia Lee D'Armon to Klele. Savas testified that the consideration for the sale to Klele involved the assumption of witness' notes held by Gabriel Ghiz, though he said he "charged a little more".

The deed of Edward Ghiz to Savas, Ayash and Klele, partners as Mallory Mercantile Company, dated March 28, 1935, is also denominated as a "deed". This deed recites a consideration of $1.00 in cash, the payment of $500.00 on or before January 1, 1936, as evidenced by a nonnegotiable note, bearing date March 28, 1935, executed by Mallory Mercantile Company, payable to Edward Ghiz on or before January 1, 1936; and the further consideration of payment on the part of Savas, Ayash and Klele of the sum of $3,000.00 within five years, being money owed by Edward Ghiz to the estate of Habib Ghiz.

The deed of Edward Ghiz to Savas, Ayash and Klele, dated October 15, 1936, of his one-seventh interest in Harvey Ghiz, Jr.'s interest in the estate of his father, recites a cash consideration of $350.00.

Savas testified that he paid Edward Ghiz $1,500.00 in cash and assumed his share of the debt in the amount of $19,000.00 owed on the Planters Bank Loan. Savas testified that he discharged the indebtedness due on the Planters Bank Loan when the notes became due about 1938 or 1939; that Sam Ammar paid the balance of the notes, in the amount of $9,000.00, and witness reimbursed Ammar.

The deed of M. H. (Michael) Ghiz to Albert Klele, dated September 16, 1935, conveying a full one-eighth undivided interest in all the real estate of which his father died seized and a like interest in the Huntington property of which his mother died seized, recites a consideration of $1,000.00 in cash, a negotiable promissory note in the amount of $100.00, executed by Klele, and payable to M. H. Ghiz; and the further consideration of the assumption of payment by Klele of three certain negotiable promissory notes: (1) A note dated September 16, 1935, in the amount of $3,970.12, executed by M. H. Ghiz, and payable to the

order of Albert Klele, guardian of Louis, Harvey, Jr., and Theodore Ghiz, at the National Bank of Logan ninety days after date, with interest at six per cent from date; (2) a note in the amount of $1,500.00, dated May 4, 1934, made by M. H. Ghiz, and payable to the order of Ammar Brothers at the National Bank of Logan without interest; and (3) a note in the amount of $3,500.00, dated October 15, 1934, made by M. H. Ghiz, payable to the order of the Virginia Life Insurance Company of Richmond, Virginia, with interest at six per cent in semi-annual payments between October 15, 1935, and April 15, 1939.

According to Michael Ghiz, Klele sent him to Sam Ammar about the middle of 1934, who in turn sent witness to James E. Greever, an attorney practicing in Logan County, to procure what witness terms a mortgage. Michael testified that he was to receive $1,500.00, but Ammar required a $350.00 bonus and $60.00 in payment of interest in advance, so the witness actually received a check for $1,090.00, which he cashed, kept the $90.00, and left $1,000.00 with Klele, with instructions that it be held for him; but later, according to Michael Ghiz, Klele gave him $900.00 and kept $100.00 for helping get a lawyer for witness.

Michael Ghiz testified that Klele was to sell the Huntington property for $10,000.00, and apply the money to the indebtedness against the property, but he testified that he did not receive any share from this sale. Since witness' mother, Ady Ghiz, had executed a deed of trust on the Huntington property in the amount of $12,000.00, which was unsatisfied at the time of the sale, Michael was not entitled to receive anything, but he testified that Klele said he would give him $300.00.

Edward Ghiz was married in 1933, and, in order to obtain employment, he asked Klele to give him some money to go to Canton, Ohio. On another occasion he sought to obtain from Klele $1,500.00, to enable him to go into business. Evidently acting on Klele's advice he went to Savas, who advanced $500.00, which witness said was to be paid out of the income.

In 1937 Michael Ghiz obtained employment in Cincinnati, and had gone to Mallory Mercantile Company to get $250.00 to make a down payment on an automobile. On that occasion Klele said that Michael Ghiz transferred his one-seventh of a one-eighth interest in the estate to Sam Ammar, and turned his furniture in Logan over to the latter. At Cincinnati he worked in a defense plant, but stopped work there in 1944, and returned to Logan in order to discuss his affairs with Sam Ammar. It was then, according to this witness, that he first learned that the Ammars did not intend to return the property to him. He testified that after that time he considered trying to get the property back. In furtherance of this purpose a lawyer from Baltimore was temporarily employed, who went to Logan, spent a few days there, and then advised that the matter be allowed to rest until the return of Edward, who had joined the armed forces of the United States in 1940, and Gabriel, who had joined in 1941.

At the time this suit was pending, the plaintiff Michael Ghiz was forty-four; Gabriel was forty-one; and Edward was thirty-nine, so that when Michael executed the deed to Albert Klele in September, 1935, he was thirty years old; when Gabriel made his deed to the Union Trading Company on January 4, 1934, he was twenty-six; when Gabriel made his second deed to Albert Klele on August 26, 1937, he was twenty-nine; and when Edward Ghiz made his deed to Mallory Mercantile Company on March 28, 1935, he was twenty-five years of age. When the transactions here under attack were made the plaintiffs were men of mature years, and *sui juris,* in every sense of the term. In addition counsel for the defendants stress the fact that plaintiffs were persons of at least ordinary, native intelligence, and had the advantage of good educations. Edward Ghiz testified that he had been graduated from Greenbrier Military School at Lewisburg, West Virginia; that he had attended that institution eight years; and that he then entered Marshall College, at Huntington, West Virginia, when he was twenty years of age, but failed his scholastic work in his first year. He also testified that Michael attended Logan High School, and then spent one year at

West Virginia University, and three years at Marshall College. Gabriel testified that he had attended Greenbrier Military School for six years; and that he completed three years of the high school course.

From a careful review of this record it seems that the plaintiffs were not frugal in their habits. The many vouchers contained in this record exhibiting payments out of their father's estate to the plaintiffs, including at least as to one of the plaintiffs, the redemption of bad checks, together with the constant importuning of all the plaintiffs for money from the estate of Habib Ghiz, including borrowings from the funds of the guardian of their infant brothers, indicate that plaintiffs were the aggressors in the transactions between them and Klele, and the partnerships of Savas, Ayash and Klele, known as Union Trading Company and Mallory Mercantile Company. In fact, under date of February 17, 1937, Michael Ghiz wrote a lengthy letter to his uncle, Albert Klele, importuning him to lend him five hundred dollars with the former's share of the furniture in the Aracoma Hotel as security for the purpose of enabling him to go to South America to "seek a new life and try and forget my old life." He wrote: "I have called upon you time and again to loan me money to establish myself, you have given me the money thinking I mean what I say. As soon as I received the money I gambled it way. Again the same thing happened again and again. I made repetition of gambling. So on until I borrowed from Ammar and again I gambled it away until finally I sold you my share and the money went the same way and the same with Harvey's interest, * * *. I know it is futile to ask you for money because if you would give it to me, you know as well as I do I will gamble it away."

Under date of November 15, 1937, Edward Ghiz wrote to Nick Savas, in regard to the conveyances which he made to Savas. He said: "I have heard reports that there would be trouble about my share of the estate because my wife did not sign the bill of sale. Nick, I want to remove all doubt about this matter. I sold you the part that

I owned outright because I wanted to sell it and not to be bothered any more with it. * * * I was not influenced by anyone, that I sold my share impartially and without fear."

The plaintiffs testified as to various conveyances which they severally made to Savas, Ayash and Klele, either individually or as partners. According to their testimony the conveyances, though absolute in their terms, were understood to be mortgages to secure money borrowed from the various defendants, or through Klele from the guardianship funds of the infants. On the other hand, both Klele and Savas testified that at the time the conveyances were made they were intended to be absolute; that there was no understanding that they were to be mortgages; and that there was no agreement or representation that they would be reconveyed, except that Klele during the course of his testimony made several statements to the effect that he had retrieved from Union Trading Company Gabriel's interest in Habib Ghiz's estate, because he wanted to hold it for him, and, further, that he told Michael that he would let him have his interest back if he (Michael) ever obtained money to repay the witness. He also testified that he was forced to convey Gabriel's and Michael's one-eighth interests by deed, dated September 22, 1936, to S. A. Ammar in order to pay fifteen hundred dollars, which Michael owed to Ammar, and $6,200.00 to replace overdrafts in his (Klele's) guardianship account, prior to final settlement (1937) and resignation. He testified that as each infant became of age he was paid, either from witness's personal funds or by borrowing.

We are impressed with the fact that, at the time plaintiffs made the conveyances under attack, there was, as this record discloses, a severe depreciation and deflation of property values in the City of Logan; money was scarce and hard to obtain; the Logan property was incumbered by the deeds of trust securing the Planter's Bank Loan, which was reduced from time to time until the balance was assumed and paid off by Ammar. As the able trial

chancellor remarked in his opinion, at the time the conveyances were made, "There was no sale for anything to speak of except at a sacrifice price." Though the Aracoma Hotel was appraised in the Habib Ghiz estate at $100,-000.00, Mr. L. G. Burns, the first administrator of the estate and guardian of the infant children, testified that about the time the transactions in question were consummated, the hotel was worth $40,000.00, notwithstanding it was heavily encumbered. This record likewise discloses that during the precarious times in the City of Logan, as well as elsewhere in the country, great difficulty was experienced in the profitable management of the Aracoma Hotel. One person in charge of the management, the testimony reveals, was relieved therefrom after he had acquired an accumulated indebtedness of $9,000.00. Michael Ghiz, who for a time acted as bookkeeper for the hotel under the previous management, leased the hotel from the estate, but after a few months he defaulted in his rent and lost the lease.

In the appraisement of this case the status of Albert Klele is important. On August 15, 1932, at which time he was the legal guardian of the four then infant children of Habib Ghiz, deceased, he entered into a contract with Michael, Edward, Gabriel and Luther Ghiz, who at that time had achieved their majority, whereby he was appointed the latter's agent "with full power in the premises to handle all of said improved real estate, collect the rentals thereon, and lease the same, do all necessary repairs, keep the property insured, pay the taxes thereon, and do any and all other things necessary to properly preserve said estate and derive therefrom the most revenue possible." It is important to note: (1) that this agreement does not provide for power to sell; (2) that, in entering into it, Klele was dealing with persons *sui juris;* and (3) that Albert Klele's status under this agreement was that of a mere agent to manage and lease the property of the four adult children of Habib Ghiz.

The following questions are presented by this record: (1) Are the conveyances from the plaintiffs to Klele and

his partners absolute conveyances or mortgages; (2) if the conveyances are not mortgages, were the grantees under any duty to reconvey the interests conveyed to them under express or implied promises to do so; (3) were the defendants, Savas, Ayash and Klele, guilty of actual fraud in connection with the conveyances from the plaintiffs to them; and (4) was the status of Klele and his partners such that, in the absence of actual fraud, the conveyances from the plaintiffs are *per se* or constructively fraudulent? If the answers to all of the foregoing questions were properly decided by the trial chancellor in the negative, the question whether the Ammars are purchasers for value without notice does not arise.

The first question presented to us on this record is: Are the conveyances from the three plaintiffs to Savas, Ayash and Klele, as partners and individually, absolute conveyances, or, as contended for by plaintiffs, are they mortgages?

The deeds executed by the plaintiffs are absolute on their faces, but they may be established as mortgages by parol. *Hoffman* v. *Ryan,* 21 W. Va. 415; *Ross* v. *Midelburg,* 129 W. Va. 851, 867, 42 S. E. (2d) 185. And, where a debt is due at the time of the conveyances, a court of equity will always lean in favor of regarding the conveyances as mortgages rather than conditional sales. *Thacker* v. *Morris,* 52 W. Va. 220, 43 S. E. 141; *Davis* v. *Demming, et al.,* 12 W. Va. 246.

If plaintiffs' evidence be taken as true, that at the time of each conveyance there was a debt due from the grantor to the grantee, or grantees, and both grantors and grantees understood that the deeds in question were mortgages, plaintiffs would be entitled to have the conveyances so declared. Undoubtedly, there were debts due from the plaintiffs to the grantees in their respective deeds at the time of the execution thereof, or were created simultaneously with the transfer of the interests. As to Klele, as the agent for the adult sons of Habib Ghiz, and as guardian for the infant children, the plaintiffs had created by their

constant borrowing an overdraft which resulted in money properly belonging to the guardian's account being withdrawn and turned over to these plaintiffs. It is difficult for us to hold that these overdrafts were not debts. Even as to the conveyances to Klele individually, who as guardian was liable on his accounts to the infant defendants, and advanced money from the guardian funds, these overdrafts were debts. As all of the transfers from the plaintiffs were made upon the payment of money or at the time there was a preexisting debt, an essential element of a mortgage is present. As this Court said in the recent case of *Ross* v. *Midelburg, supra,* p. 871: "If the purpose and the intention of the parties to a transaction are to create a loan and by so doing establish the relation of creditor and debtor between them, and the title to the property conveyed with an agreement to reconvey or an option to repurchase is held by the lender as security for the payment of the debt, the deed is in fact a mortgage, and the maxim 'Once a mortgage, always a mortgage', applies." So a debt being present and underlying all of the conveyances from plaintiffs, and there being no defeasance clauses in the respective deeds, and no outstanding supplemental agreement as existed in the *Midelburg* case, the question arises, can parol evidence be used to establish the conveyances as mortgages, notwithstanding they are absolute on their faces? This Court in the early case of *Lawrence* v. *DuBois,* 16 W. Va. 443, pt. 1 syl., held: "Though a deed be absolute on its face, the real nature of the transaction can be proven by parol evidence or surrounding circumstances, and the deed be held to be a mortgage." In the body of the opinion this Court said at page 459: "* * * But it is perfectly well settled almost everywhere, and especially in Virginia and West Virginia, that such an absolute sale may be converted into a conditional sale or a mortgage by proving that the real intention of the parties was that it should not be an absolute sale, and that such intention may be proven by the surrounding circumstances and by parol proof. It is unnecessary to cite authorities to establish this position, which is, so far as I know, almost universally admitted; but the

cases of *Klinck* v. *Price,* 4 W. Va. 4, and *Davis, Committee* v. *Demming et al.,* 12 W. Va. 246, establish this to be the law in this State." In point 2 of the syllabus in that case, the Court gives three indicia, which have great weight in determining whether a deed absolute on its face is nevertheless a mortgage: "* * * First, Where the parties admit that the grantor owes after the execution of the deed the consideration of the land to the grantee as a debt. Second, If this alleged consideration is grossly inadequate. Third, If the vendor remains in possession of the land for many years without the payment of any rent."

Perhaps the leading early West Virginia case involving the question whether a deed absolute on its face is, in fact, a mortgage, is the case of *Davis* v. *Demming, supra,* in which Judge Green, at page 282, uses the following language: "Parol evidence, the declarations and conduct of the parties at the time of the transaction or subsequently, as well as all the circumstances attending or surrounding the same are received to show, whether the transaction was a conditional sale, or mortgage; and this is done though the deed, or bill of sale be absolute on its face."

With the well established rules set forth in the *Lawrence, Davis* and *Midelburg* cases, let us at this time turn our attention to the record to see whether these plaintiffs by sufficient evidence have established that their conveyances were, in fact, mortgages. The record discloses the presence of one of the circumstances having great weight in determining that a deed absolute on its face is a mortgage, that is, at the time the conveyances were made the grantors became indebted to the grantees, or there was a preexisting debt, as in the case of the overdrafts due and owing from the grantors to the grantees.

We, however, do not find the other two circumstances, enumerated in the *Lawrence* case as having weight on the question whether a deed absolute on its face is a mortgage, presented in this record. In the first place, no change of possession of the property was effectuated by the transfers, for under the guardianship of the infant children, as

well as the agency agreement providing for management of the property which the plaintiffs executed, they were never in possession of the property. The agreement as to the management of the property contemplated that the possession be in Klele during the duration of the agreement. In fact, the three plaintiffs, together with their brother, Luther Ghiz, who at the time the agreement was entered into on August 15, 1932, were the four adult children of Habib Ghiz, expressly covenanted in the agreement "that they will not interfere with the said second party [Klele] in the management of said real estate or any part thereof." Though technically the possession of the agent is that of the principal, nevertheless, in the final analysis, the burden of proving that a deed absolute on its face is in fact a mortgage rests on the grantor of the deed. Therefore, it is the grantors' duty in the instant case to prove that their conveyances to Savas, Ayash and Klele, as partners and individually, were intended to be mortgages by whatever indicia that may be available to them, one of which, under the rule in the *Lawrence* case, is that the grantor after the conveyance retains possession of the property conveyed as against the grantee. In the instant case, the grantors had no possession to retain or transfer because, as heretofore indicated, prior to the conveyances, under the agency agreement, Klele had the exclusive right to mortgage and lease the property without any right on the part of the other parties to the agency agreement, namely, Michael, Gabriel, Luther and Edward Ghiz to interfere with such management. So that the rule prescribed in the *Lawrence* case that a retention of property by a grantor or grantors conveyed by a purportedy absolute conveyance is an indicum of a mortgage has not been met. The rule in that case contemplates a retention of possession by the grantor in a deed absolute on its face, alleged to be a mortgage, as against the grantee, a situation not portrayed in this record.

Nor can we say from this record that the consideration was grossly inadequate. Though the Aracoma Hotel, which was the main item of real estate of which their father died seized and possessed, was appraised in dece-

dent's estate at $100,000.00, L. G. Burns, the first administrator, testified that about the time the conveyances were made, the Aracoma Hotel was worth about $40,000.00. As heretofore indicated, during the precarious times of 1934, 1935, and 1936, real estate values, as appears from evidence concerning other properties, were greatly deflated in the City of Logan. The real estate in which the plaintiffs conveyed their interests was heavily encumbered under Planters Bank Loan, no part of which indebtedness was ever paid by these plaintiffs; but was liquidated by plaintiffs' grantees and the Ammars, the purchasers from said grantees. The hotel property, which at the time of the death of Habib Ghiz had substantial value, was difficult of successful and profitable management because of the financial stress of that time. One of the hotel managers gave up the management with a $9,000.00 indebtedness. Even the plaintiff, Michael Ghiz, who leased the hotel property, after a few months defaulted in the payment of rent and lost the lease. Plaintiffs' interests in their father's estate were greatly encumbered. The Huntington house, which belonged to plaintiffs' mother, notwithstanding it had cost $33,000.00, was sold for $10,000.00, which was $2,000.00 less than sufficient to satisfy the existing deed of trust. These plaintiffs, as the trial chancellor indicated in his opinion, seemed bound to dispense with their inheritance, and the trial chancellor, in our opinion, was entirely justified in deciding that in order to obtain money quickly, they were willing, and did, sell their interests at prices which were consonant with the then deflated values of property. If the property has increased in value since their conveyances, due to a change in the financial conditions in the City of Logan and the country generally, as this record discloses, so that the prices at which plaintiffs' conveyed the property would be inadequate at the time of the trial of this case, they nevertheless were not at liberty to gamble with their father's estate, and sell their interests on the basis of the then deflated values, and now, as late as 1947, when this suit was brought, and there has been a change in the circumstances surrounding the property, which originally belonged to

their father's estate, try to retrieve their interests on the basis of mortgages, unless they clearly establish that position. The letters of Edward and Michael Ghiz indicated that they were straitened in their circumstances, and weaken greatly the position of these two plaintiffs that their conveyances were not absolute but were mortgages.

The plaintiffs' testimony is the only evidence tending to establish that the conveyances were, in fact, mortgages. Their testimony, in our opinion, is no more credible than that of Savas and Klele, who testified that there was no understanding that the conveyances were mortgages. As all of the plaintiffs and these two defendants were interested parties to this suit, we cannot weigh their testimony as the trial chancellor had the right to do, and we do not. Most convincing is the testimony of Judge C. C. Chambers, now Judge of the Circuit Court of Logan County, who disqualified himself in this case, and the testimony of Ira P. Hager, a prominent attorney in Logan, to the effect that when they took the plaintiffs' acknowledgments to various deeds there was no understanding effectuated, that the conveyances were, in fact, mortgages. Both of these gentlemen at the time the conveyances were made were skillful and ethical lawyers practicing at the Bar of Logan County, and had no interest in the outcome of this case. The trial chancellor was at liberty to give the testimony of these disinterested witnesses great weight, and, in doing so, in view of the conflict in the evidence, we will not disturb his finding to the effect that there was no understanding that by their absolute conveyances, these plaintiffs intended a mortgage. Many times this Court has held that it will not disturb a trial chancellor's finding upon an appeal, unless it is plainly wrong or against the preponderance of the evidence. *Bennett* v. *Neff,* 130 W. Va. 121, pt. 6 syl., 42 S. E. (2d) 793; *Sutton* v. *Sutton,* 128 W. Va. 290, 36 S. E. (2d) 608; *Shipper* v. *Downey,* 119 W. Va. 591, 197 S. E. 355. So we hold, as we believe we are bound to do, in view of the finding of the trial chancellor, that these conveyances were not, in fact, mortgages.

Likewise the evidence conflicts on the question whether the grantees in the deeds executed by plaintiffs and now under attack are under any duty to reconvey under a promise, either express or implied. Aside from the unsupported testimony of each plaintiff, as to his own deeds, there is no evidence in this record tending to show that such an agreement existed at the time these deeds were executed, except that Klele stated during the course of his examination that he intended to reconvey the property deeded to him upon payment of the indebtedness but upon default of the payment of the indebtedness he was compelled to convey the property to Ammar to satisfy plaintiffs' overdrafts so that he could make settlement of his accounts as guardian of the infant brothers of plaintiffs as they became of age. Moreover, as counsel for defendants assert in their brief, the fact that the grantees executed notes to the plantiffs, assumed overdrafts made by them, and assumed payment of Planter's Bank Loan against their interests, is not consonant with the oral and unsupported testimony of plaintiffs given at the trial of this case in 1949, many years after the conveyances were made. In regard to this question of fact, we apply the rule heretofore stated, which precludes this Court from disturbing the finding of the trial chancellor.

The last of the factual questions bearing on the conveyances by plaintiffs, is whether the conveyances from plaintiffs were tainted with actual fraud on the part of the grantee-defendants.

The plaintiffs were mature men at the time the conveyances were made, the youngest then being twenty-five years of age. They had more than ordinary educations. Living in the City of Logan during most of their lives, naturally they were familiar with the properties belonging to their father. They were persistent in their efforts to obtain money from their father's and deceased brother's estate, including the interest of their infant brothers, on the basis of which they conveyed their own interests in the property. In this jurisdiction fraud not only must be alleged, but it must be clearly and distinctly proved. *Zogg*

v. *Hedges,* 126 W. Va. 523, 530, 29 S. E. (2d) 871, and the many cases cited in that opinion. This record is devoid of any evidence of concealment, or lack of knowledge on the part of these plaintiffs. These conveyances were made because of the importunities on plaintiffs' part, and not because of any effort on the part of the defendants to defraud or deceive the plaintiffs. True, there was some mismanagement on the part of one of the administrators of the estate, and on the part of Klele in using the infants' funds for the accommodation of these plaintiffs, but that mismanagement, so far as this record is concerned, is not disclosed to have worked to plaintiffs' detriment.

The last of the questions before us involving the immediate transaction between the plaintiffs and their grantees, Savas, Ayash and Klele, presents the legal question whether the relationship between these parties and Klele, as the agent employed by plaintiffs and their brother Luther, to manage their father's estate, and Klele, as guardian of the then infant children of Habib Ghiz, was such that the transactions between the plaintiffs and their grantees were fraudulent *per se,* that is, tainted with constructive fraud. The fact that Klele was acting as guardian of the infant children has no bearing on this case. So far as these plaintiffs are concerned, this case does not involve any of the following fiduciary or quasi fiduciary relationships: (1) A personal representative and beneficiary; (2) guardian and ward; (3) committee and incompetent; (4) trustee and *cestui que* trust; (5) attorney and client; and (6) an agent with express or implied authority to sell his principal's property. Savas and Ayash bear no relationship to these plaintiffs by consanguinity or affinity: they were strangers as to plaintiffs, in the sense that as to conveyances to them the parties were dealing at arm's length. But it is said that because Klele is an uncle of these plaintiffs, and the agency agreement gave Klele full power to manage and lease the property, he held a fiduciary or quasi fiduciary relation to plaintiffs so that the conveyances to him, even in the absence of actual fraud, were fraudulent *per se,* or constructively fraudulent, and are, therefore, vulnerable in this suit at the

instance of the plaintiffs. With this position we do not agree. As we have said, Klele had no knowledge concerning this property not available to plaintiffs. There was no withholding of knowledge by him, and no actual concealment. The properties were there in the Cities of Logan and Huntington and plaintiffs from time to time lived in part of the property and in the vicinity where it was located. One of the plaintiffs even leased the hotel and served as bookkeeper thereof under a prior lessee or manager. There is a clear distinction in the cases between an agent, who has power to sell the principal's property, and who, either directly or by mediary obtains title to the property for himself, and an agent, having no such power of sale and having no knowledge peculiar to himself, who deals with a *sui juris* principal for the transfer of the property. No rule of law would be more far afield from abstract justice between parties if a mere agent, in the absence of fraud or concealment, cannot deal for the acquisition of the property with his principal.

As to the sale of plaintiffs' interests to Savas, Ayash and Klele, as partners, the plaintiffs were persons *sui juris* dealing with purchasers at arms' length.

In *Dickey* v. *Volker*, 321 Mo. 235, 11 S. W. 2d 278, 62 A. L. R. 858, in which the Court had under consideration the qualification of agents for the management and operation of property belonging to a public charitable trust to purchase from the trustees thereof named as agents to sell, held that a mere agency for management does not disqualify an agent from dealing with his principal, namely, the trustees, outside the subject of the agency. The Court said: "Their duties [those of managing agents] were limited to management and operation. The agency does not fall within the rule applicable to guardians and wards, trustees and *cestui que* trust, agents to sell, and similar relationships, * * *". In *Douglass* v. *Lougee,* 147 Iowa 406, 123 N. W. 967, cited with approval in the *Dickey* case, the court said: "Where an agent has no power to sell property, but is to lease it or collect the rents, and the agent enters into independent negotiations with the prin-

cipal to purchase the land, no suspicion of fraud arises from that fact alone, and the agent is not bound to assist the principal to obtain the highest possible price, since, from the moment he attempts to buy the parties as to that transaction are dealing at arm's length." In the decision of this case, we need not go as far as the Iowa Court went in its decision, when it said that "* * * the agent is not bound to assist the principal to obtain the highest possible price," because, as shown by this record, Klele, as agent for the plaintiffs, could have been under no duty to obtain the highest possible price for plaintiffs' interests in the properties, there being at the time of the conveyances no available market for property in the City of Logan. We are constrained to adopt the statement of this Court in the case of *Sperry* v. *Sperry,* 80 W. Va. 142, 154, 92 S. E. 574, that: "The principle of law applicable to transactions between principal and agent is simple and well understood, and we find it nowhere better or more clearly stated than in 2 C. J., pages 706, 707, where it is said: 'As a general rule an agent is not permitted to enter into any transaction with his principal on his own behalf respecting the subject matter of the agency, unless he acts with entire good faith and without any undue influence or imposition, and makes a full disclosure of all the facts and circumstances attending the transaction. The existence of the relation does not of itself forbid transactions between the principal and agent; and, since the above rule exists to protect the principal, it has no application to cases in which the agent openly and fairly deals with the principal, without any concealment or deception, as in such cases an agent is as competent to deal with the principal as another.' " In one of the two companionate cases, involved in the *Sperry* case, this Court cancelled deeds from a principal to an agent, together with power of attorney from the principal to the agent, "with the most ample powers of sale and distribution" of valuable property. The agent acting under his power of attorney sold the property, and attained the title thereto at only a fraction of its value. The record in that case shows a material misrepresentation with reference to the dissolution of an

injunction which the principal's wife had obtained against him as to the disposition of the property; and the record discloses that the agent was an experienced older man, the sheriff of McDowell County, and the principal was a man of dissolute habits and doubtful business acumen. In setting aside the deeds and power of attorney, this Court in syllabus 2 of the case said: "* * * and where the principal is infirm or of doubtful business capacity, very slight circumstances will suffice to cause the Court to set aside the dealings between principal and agent." The *Sperry* case, though the opinion in that case recognized the principle contended for by plaintiffs herein, is not in point with this case. Unlike Klele, the agent in the *Sperry* case had almost unlimited powers of sale, there were material misrepresentations and the principal in that case, owing to the circumstances portrayed by the record, was dealing with his agent upon decidedly unequal terms.

The case of *Harrison* v. *Miller*, 124 W. Va. 550, 21 S. E. (2d) 674, cited by counsel for plaintiffs, in support of the proposition that the mere relationship between parties, plaintiff and defendant, renders the transactions in question fraudulent *per se*, has no bearing upon the question immediately under consideration. The record in that case discloses the shocking situation of an executor of an estate, in which the plaintiffs therein owned interests, which executor was also guardian of the infant owners of the estate, and a creditor of the estate, who as such creditor caused a sale of the property under the deed of trust securing the notes held by him, and bought the property at the trustee's sale. Though the case involved no actual fraud, it concerned a fiduciary, actively working against the interest of the estate which he represented to obtain the corpus thereof as against the beneficiaries under the will in which he was named executor, and against the wards of whom he was the guardian.

In resolving the question whether, because of the relationship between the parties, the transaction was fraudulent *per se*, we need not rely upon the case of *Brown* v. *McGraw*, 98 W. Va. 607, 128 W. Va. 124. That case did

not involve a sale between a *sui juris* principal and a mere agent to manage property, but because the sale in the *Brown* case was by virtue of judicial decree, this Court, in the absence of actual fraud, sustained the transaction. In the recent case of *Bank of Mill Creek* v. *Elkhorn Coal Corporation,* 133 W. Va. 639, 57 S. E. (2d) 736, doubt was expressed as to the soundness of the doctrine enunciated in the *Brown* case. Nor is the case of *Spriggs* v. *McCreery,* 87 W. Va. 204, 104 S. E. 479, cited by counsel for defendants, applicable to the question under consideration. That case involved (1) active fraud on the part of an agent amply vested with power as to his principals' property, situated in Raleigh County, who, by the manipulation of the property in a partition suit in which the agent was one of the commissioners, and (2) a representation to the owners, who were nonresidents of the State that there was a cloud on the principals' property, which necessitated conveyance of a part of the property to the agent, McCreery. This Court stated in that case that the agent had obtained 1,500 acres of his principals' land by his inequitable conduct "for nothing".

In their supplemental brief, counsel for plaintiffs, after referring to cases thereinbefore cited, say that these cases "concern only agents in one capacity or another, where the relation is strictly of a fiduciary nature." After a consideration of the cases, we agree with counsels' statement.

Counsel for plaintiffs in their supplemental brief, also rely upon the case of *Carleton Mining & Power Co.* v. *West Virginia Northern Railroad Co.,* 113 W. Va. 20, 166 S. E. 536, as one in which a constructive trust was held to be created, though there was no express fiduciary relationship. This case, however, concerned the wrongful blending of accounts belonging to a plaintiff with the accounts from other properties under defendant's control.

No case decided by this Court holds that where an agent deals with a *sui juris* principal, in the absence of fraud, and concealment of pertinent knowledge within the peculiar knowledge of the agent, with reference to the principal's property, the relationship of principal and agent of

itself renders a sale from the principal to the agent fraudulent *per se*. From a careful consideration of this question, and an examination of the authorities, bearing in mind that no fiduciary relationship exists between the parties, we hold that the transactions in question between the plaintiffs and the defendants, as partners and as individuals, were not fraudulent *per se*.

From the foregoing it appears that the sale of plaintiffs' interests in the estates of their father and deceased brother to Savas, Ayash and Klele, as partners and as individuals, gave to the grantees such title as the grantors had at the time of the conveyances. It follows that the question whether the Ammars were purchasers for value without notice is moot.

Accordingly, the decree of the Circuit Court of Logan County is affirmed.

*Affirmed.*